# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS,
METRO HOLDINGS and EXPROMAN:

**ANDREW W. HULL**
**DANIEL K. BURKE**
Hoover Hull LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLANT,
QUAKER SALES & DISTRIBUTION, INC.

**THOMAS F. BEDSOLE**
**MAGGIE L. SMITH**
**RACHEL M. SCHAFER**
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**SCOTT S. MORRISON**
Krieg DeVault LLP
Carmel, Indiana

**LIBBY Y. GOODKNIGHT**
Krieg DeVault LLP
Indianapolis, Indiana



FILED
Dec 30 2014, 9:00 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| METRO HOLDINGS ONE, LLC, EXPROMAN, INC., and QUAKER SALES & DISTRIBUTION, | ) ) ) ) |
| Appellants-Defendants, | ) ) |
| vs. | )   No.  32A01-1309-PL-374 |
| FLYNN CREEK PARTNER, LLC, | ) ) ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE HENDRICKS SUPERIOR COURT
The Honorable Mark A. Smith, Judge
Cause No. 32D04-1204-PL-39

**December 30, 2014**

**PYLE, Judge**

STATEMENT OF THE CASE

In this consolidated appeal, we are called upon to address a contract dispute between parties at the summary judgment level. Here, the contract is a real estate purchase agreement between sophisticated business entities—Appellants-Defendants Metro Holdings One LLC ("Metro Holdings"); Exproman, Inc. f/k/a Exxcel Project Management ("Exproman") (collectively, "Metro"); and Quaker Sales & Distribution, Inc. ("Quaker")[1] on one side and Appellee-Plaintiff Flynn Creek Partners, LLC ("Flynn Creek") on the other side. The purchase agreement required the buyer, Metro, to purchase two contiguous parcels of real estate from the seller, Flynn Creek, on two separate closing dates.

The purchase and closing of the second property parcel is at issue in this appeal. On the day of the scheduled closing on the second parcel, Metro—relying on a term of the purchase agreement—sent Flynn Creek a notice, indicating that Flynn Creek had failed to satisfy certain closing conditions and invoking the sixty-day period for Flynn Creek to satisfy the disputed closing conditions. Flynn Creek—also relying on a term of the purchase agreement—responded by sending Metro a letter, asserting that Metro had defaulted in its performance under the purchase agreement by failing to purchase the second property parcel. Thereafter, Metro—relying on yet another term of the purchase

---

[1] Quaker was the original party to the purchase agreement but assigned its rights and obligations under the agreement to Exproman on the same day it signed the purchase agreement. Exproman later assigned its rights to Metro Holdings.

agreement—sent Flynn Creek a letter, stating that it was electing to terminate the purchase agreement due to the presence of wetlands on the second property parcel.

Ultimately, Flynn Creek filed a suit for breach of contract against Metro and Quaker based upon Metro's failure to purchase and close on the second property parcel. Flynn Creek sought specific performance of the purchase agreement or an alternative remedy of damages for its breach of contract claim. Metro counterclaimed, arguing that Flynn Creek had repudiated or anticipatorily breached the purchase agreement. After the parties filed cross-motions for summary judgment,[2] the trial court granted Flynn Creek's motion for summary judgment (finding, in relevant part, that Metro had breached the purchase agreement by failing to purchase the second property parcel and that Flynn Creek was entitled to specific performance of the purchase agreement) and denied Metro's cross-motion for summary judgment.

Metro now appeals, challenging the trial court's grant of summary judgment on Flynn Creek's breach of contract claim and request for specific performance and the trial court's denial of its repudiation claim. Metro's main appellate argument is that Flynn Creek, as a seller in this real estate transaction, was not entitled to the equitable remedy of specific performance where an adequate remedy at law existed. Additionally, Metro argues that the trial court erred by denying summary judgment on its repudiation claim.

Because our Indiana Supreme Court has explained that specific performance is an available remedy to a seller of real property even though the seller may have action at law and because the parties included a specific provision in their contract that Flynn Creek

---

[2] Quaker did not file a summary judgment motion but did attend the summary judgment hearing.

3

had the right to specific performance upon a default by Metro, we affirm the trial court's grant of summary judgment on Flynn Creek's breach of contract claim and request for specific performance. Additionally, because Metro did not show on summary judgment that Flynn Creek's actions constituted a clear or absolute statement that Flynn Creek was repudiating or anticipatorily breaching the Purchase Agreement, we affirm the trial court's denial of summary judgment on Metro's repudiation claim.

We affirm.

## ISSUE

We consolidate the issues presented and restate the issue on appeal as:

Whether the trial court erred by granting Flynn Creek's motion for summary judgment and denying Metro's cross-motion for summary judgment.

## FACTS[3]

We first point out that many of the facts designated as evidence in this summary judgment proceeding are subject to a trial court order excluding them from public access.

---

[3] We note that Metro's Statement of the Issues, Statement of the Case, and Statement of the Facts are not in compliance with our Appellate Rules. Most notably, Metro's Statement of the Case contains argument and does not "briefly describe the nature of the case, the course of proceedings relevant to the issues presented for review, and the disposition of these issues by the trial court[.]" *See* App. R. 46(A)(5). We direct counsel's attention to Appellate Rules 46(A)(4)-(A)(6), relating to the required content for an Appellant's Statement of the Issues, Statement of the Case, and Statement of the Facts. Contrary to Appellate Rule 50, Metro has failed to include "pleadings and other documents from the Clerk's Record . . . that are necessary for resolution of the issues raised on appeal[,]" including Flynn Creek's summary judgment filings and designated evidence. *See* App. R. 50(A)(2)(f). Additionally, neither party included a copy of Metro's answer to Flynn Creek's complaint or a copy of Flynn Creek's answer to Metro's counterclaim in its Appendix. Finally, Metro has improperly included in its Appendix pleadings that were struck from the record by the trial court (i.e., Metro's Supplemental Brief in Support of Summary Judgment, Metro's Second Supplemental Designated Evidence, and Metro's Reply in Support of its Motion to Correct Error). Metro does not challenge the trial court's orders to strike these pleadings but has, nevertheless, included these pleadings in its Appendix contrary to Appellate Rule 50. As these were not part of the record below, we will not review them on appeal. We remind Metro that compliance with our Appellate Rules ensures that our appellate review of the issues is not impeded.

4

As such, portions of the parties' appendices are filed on green paper and marked as "confidential" or "not for public access." *See* Ind. Admin. R. 9. We have attempted to exclude such matters from this opinion. However, to the extent such matters are included in this opinion, we deem such information to be essential to the resolution of the litigation or appropriate to further the establishment of precedent or the development of the law. *See* Admin. R. 9(G)(3); 9(G)(4)(c)(ii)(B),(C).

Before addressing the relevant facts, we pause briefly to review the parties on appeal. This appeal involves a real estate purchase agreement between seller, Flynn Creek, and purchaser, Quaker, who assigned its rights as purchaser to Exproman, who then later assigned its rights to Metro Holdings. Flynn Creek is a joint venture between Midwest Logistics Partnership, a Holladay Properties' subsidiary, and Airwest Partners, a Denison Properties' subsidiary. Metro Holdings and Exproman are real estate construction firms and development companies owned by F. Douglas Reardon ("Reardon") and are headquartered in Ohio. Metro Holdings was formed to "develop, design and build [a distribution] facility for Quaker." (Appellee's App. 1121). Quaker is a Delaware corporation and is a subsidiary of Pepsico.

In 2006, a representative from Pepsico approached Flynn Creek about obtaining property so it could build a distribution facility for Quaker's use. On March 12, 2007, Flynn Creek entered into a real estate purchase agreement ("Purchase Agreement") with Quaker. Under the Purchase Agreement, Quaker agreed to purchase from Flynn Creek approximately 106 acres of real estate located in the Ameriplex Business Park in Marion County and Hendricks County.

5

The Purchase Agreement provided that Quaker would purchase the real estate in two different phases. In the first phase, Quaker was to purchase approximately seventy-six acres of land ("Phase 1 Property") for $6.84 million. Quaker planned to build a one-million-square-foot Gatorade distribution facility on the Phase 1 Property, and Exproman was the proposed developer of the project.[4]

In the second phase, Quaker was to purchase the remaining acres ("Phase 2 Property"), which abutted the Phase 1 Property, for a base amount of $750,000 plus an additional amount per net acre depending on the date of the closing for the Phase 2 Property. Here, the additional amount was set at $88,000 per net acre because Metro Holdings, pursuant to an option in the Purchase Agreement, twice extended the closing date for the Phase 2 Property. Thus, the total purchase price for the Phase 2 Property was approximately $3.4 million.

In regard to conditions of performance and closing on the Phase 2 Property, which are at issue in this appeal, the Purchase Agreement contained the following relevant provisions:

> 4. **Conditions of Performance**. All of the items in this Section 4 shall be completed and/or satisfied on or before [April 15,] 2007 (the "Due Diligence Period"),[5] and Purchaser's obligations under this Agreement shall be contingent upon the timely and complete satisfaction of the following conditions precedent or waiver thereof by Purchaser, in writing:

---

[4] Exproman, as the developer of the Quaker project, assisted Quaker in its negotiations of the Purchase Agreement.

[5] Section 4 of the Purchase Agreement provided that the Due Diligence Period ended on March 31, 2007, but, in an initial addendum to the Purchase Agreement (Addendum #1), the parties extended the end of the Due Diligence Period to April 15, 2007.

6

(a) Survey.  Seller has provided Purchaser with a survey of the real estate.  Purchaser shall update the Survey in accordance with ALTA/ACSM minimum detail land survey requirements (said survey, as updated hereinafter referred to as the "Survey").  The updated Survey shall:  (i) be certified to Purchaser, Seller, Title Company and any other party designated by Purchaser; (ii) be as of a current date and by an Indiana registered land surveyor; (iii) show no items which would adversely affect Purchaser's ownership or intended use of the Real Estate; (iv) reflect the boundaries of the [Phase 1 Property] and the [Phase 2 Property]; (v) calibrate the [Phase 1 Property] so it is exactly 76 Gross Acres, with the balance of the Real Estate being the [Phase 2 Property]; and (vi) reflect all existing easements, rights-of-way, roadways, floodways and flood hazard areas located within the boundaries of each of the [Phase 1 Property] and the [Phase 2 Property] . . . .

(b) Title.  Fee simple, marketable title to the [Phase 1 Property] and the [Phase 2 Property] shall be conveyed by Seller to Purchaser at the Phase 1 Closing and the Phase 2 Closing, respectively, subject only to (collectively, the "Permitted Exceptions"): (i) current, non-delinquent taxes and assessments; (ii) those defects, covenants, conditions, easements, liens, encumbrances and restrictions and other matters of record set forth in the Title Commitment (as hereinafter defined) to which Purchaser does not object pursuant to this Section 4 or, if Purchaser objects thereto, Purchaser thereafter waives such objection, in writing, and (iii) those items reflected in the Survey to which Purchaser does not object pursuant to this Section 4 or, if Purchaser objects thereto, Purchaser thereafter waives such objection, in writing.  As soon as reasonably practicable after the Execution Date, Seller, at Purchaser's cost and expense, shall deliver to Purchaser a title insurance commitment issued by Title Company covering the [Phase 1 Property] and the [Phase 2 Property] (each, a "Title Commitment" and, collectively, the "Title Commitments").  In each of the Title Commitments, Title Company shall agree to insure in the name of Purchaser and for the full amount of the [Phase 1 Property] Purchase Price and the [Phase 2 Property] Purchaser Price, good indefeasible, and marketable fee simple title to the [Phase 1 Property] and the [Phase 2 Property], respectively, subject only to the Permitted Exceptions.  If the Survey and/or the Title Commitments reveal any exceptions to title, defects or other matters Purchaser finds objectionable, in its sole discretion (collectively, "Objections"), Purchaser shall have ten (10) business days after receiving the later of the Title Commitments and the

7

Survey to provide Seller with written notice of such Objections.  If Seller is unable to cure all Objections to the satisfaction of Purchaser, in its sole discretion, within ten (10) business days after receiving notice thereof from Purchaser, and it gives Purchaser written notice of such, then Purchaser may take any one or more of the following actions: (iv) by written notice to Seller, give Seller additional time to cure such Objections to the satisfaction of Purchaser, in its sole discretion; (v) waive such Objections, in writing, and proceed with the transaction contemplated herein, in which such case such exceptions, defects and/or other matters shall be deemed Permitted Exceptions; or (vi) terminate this Agreement by giving written notice to Seller.  If Seller fails to notify Purchaser pursuant to this Subsection 4(b) of its inability to cure the Objections, then it shall be deemed that Seller has elected to cure such Objections to the satisfaction of Purchaser in its sole discretion.  At each Closing, Seller shall cause Title Company to issue to Purchaser a Form B-1970 ALTA Owner's Policy of Title Insurance in conformity with the Title Commitment covering the [Phase 1 Property] and the [Phase 2 Property], respectively including any endorsements Purchaser deems necessary (each, a "Title Policy" and, collectively, the "Title Policies").  Seller shall pay the premiums for the issuance of each of the Title Policies and Purchaser shall pay the cost of any endorsements it desires to such Title Policies.

* * * * *

(e) Wetlands Delineation Study.  Purchaser, at its cost and expense, may conduct or have conducted any wetland delineation study of the Real Estate, to determine whether there are any wetlands on the Real Estate under the jurisdiction of the Army Corps of Engineers.  In the event that wetlands are discovered on the Real Estate, at Purchaser's election, this agreement shall terminate and Purchaser shall receive an immediate refund of the earnest money, together with any interest earned thereon, or Purchaser may proceed with the purchase and receive a reduction of the per acre price to the extent of any delineated wetlands located on the [Phase 2 Property].

In the event Purchaser terminates this Agreement by written notice to Seller prior to the expiration of the Due Diligence Period, Purchaser shall receive an immediate refund of the Earnest Money together with any interest earned thereon.

* * * * *

8. **Conditions to Closing**.  All of the items in this Section 8 shall be completed and/or satisfied on or before each Closing Date, and Purchaser's

8

obligations under this Agreement shall be contingent upon the timely and complete satisfaction of each of the following conditions precedent (collectively, the "Closing Conditions") or the waiver thereof by Purchaser, in writing:

\* \* \* \* \*

(b) Real Estate. The Real Estate shall be in compliance with the provisions hereof and Title Company shall be irrevocably and unconditionally prepared to issue to Purchaser each Title Policy covering the [Phase 1 Property] or the [Phase 2 Property], as applicable, with liability in the full amount of the [Phase 1 Property] Purchase Price or the [Phase 2 Property] Purchase Price, respectively, showing Purchaser in title thereto, subject only to the Permitted Exceptions.

\* \* \* \* \*

(f) Later Title Objections. Other than the Permitted Exceptions, no additional matters affecting title to the Real Estate shall have arisen on or before each Closing ("Later Title Objections").

\* \* \* \* \*

9. **Non-Satisfaction of Closing Conditions**. If all of the Closing Conditions contained in Article 8 do not exist at or are not satisfied by each Closing Date, Purchaser may, in addition to and not in limitation of Purchaser's other rights and remedies hereunder, elect to either: (a) consummate the transaction contemplated in this Agreement; (b) extend the applicable Closing Date for one or more further periods of time in order for Seller or Purchaser to satisfy any outstanding Closing Conditions; or (c) after written notice to Seller of the non-satisfaction of a Closing Condition and the failure of Seller to satisfy the same within [sixty (60)] days[6] of receipt of such notice, receive a return of the Earnest Money together with any interest earned thereon and any Extension Fee, following which this Agreement shall terminate and none of the parties hereto shall have any further duties, liabilities or obligations to one another hereunder.

(App. 102, 104, 106, 107).

Additionally, the Purchase Agreement contained the following provisions in the event that either party defaulted on its obligations under the agreement in regard to the Phase 2 Property:

---

[6] Section 9 of the Purchase Agreement provided that the Seller had ninety (90) days to satisfy upon written notice from the Purchaser; however, in Addendum #1, the parties decreased the time for Seller's satisfaction to sixty (60) days.

14. **Purchaser's Default After Phase 1 Closing**. IF, AFTER THE PHASE 1 CLOSING, PURCHASER DEFAULTS IN THE PERFORMANCE OF ITS OBLIGATIONS UNDER THIS AGREEMENT WITH RESPECT TO THE PURCHASE OF THE [Phase 2 Property] AND FAILS TO CURE SUCH DEFAULT WITHIN TEN (10) DAYS AFTER WRITTEN NOTICE FROM SELLER TO PURCHASER SPECIFYING SUCH DEFAULT, SELLER MAY SEEK ANY REMEDY PROVIDED BY EQUITY OR LAW, INCLUDING THE RIGHT OF SPECIFIC PERFORMANCE, OR TERMINATE THIS AGREEMENT AND RECEIVE THE EARNEST MONEY AS LIQUIDATED DAMAGES.

15. **Seller's Default**. If Seller fails to cure within ten (10) days after written notice from Purchaser to Seller: (a) a default in the performance of any of its obligations under this Agreement; or (b) a breach of any of Seller's representations and warranties hereunder, then Purchaser may: (i) terminate this Agreement and receive a return of the Earnest Money together with any interest earned thereon and any Extension Fee; (ii) bring legal action against Seller for out of pocket damages incurred by Purchaser during the Due Diligence Period; or (iii) pursue specific performance of this Agreement.

(App. 109) (capitalization in original). The Purchase Agreement also provided that the prevailing party in any legal action brought in connection with the Purchase Agreement was entitled to reasonable attorney fees and court costs.

Finally, the Purchase Agreement contained the following provision regarding construction of the agreement:

30. **Construction**. This Agreement is the product of negotiation by the parties hereto and shall be deemed to have been drafted by such parties. This Agreement shall be construed in accordance with the fair meaning of its provisions and its language shall not be strictly construed against, nor shall ambiguities be resolved against, either party.

(App. 112).

On March 12, 2007, the same day as entering into the Purchase Agreement, Flynn Creek and Quaker also executed an addendum to the Purchase Agreement ("Addendum

10

#1"). Addendum #1 modified certain provisions of the Purchase Agreement, including a provision that related to Quaker's assignment of its rights under the Purchase Agreement to another party. Specifically, Paragraph 8 of Addendum #1—which amended Section 20 of the Purchase Agreement—provided, in relevant part, that Quaker could assign the Purchase Agreement to Exproman (or any other entity formed by Exproman and directed by Reardon as managing partner) provided that Exproman assumed Quaker's obligations under the Purchase Agreement in writing. Quaker also agreed that—after assigning its rights to Exproman—it would be "secondarily liable" for "any claims" or obligations under the Purchase Agreement after Flynn Creek had "exhausted all legal and equitable rights and remedies available" to Flynn Creek against Exproman or any assignee. (Appellee's App. 1095).

Also on March 12, 2007, Quaker and Exproman entered into an "Assignment and Assumption of Purchase Agreement" ("First Assignment"), wherein Quaker assigned all its rights, title, and interest under the Purchase Agreement to Exproman, who assumed all Quaker's obligations under the Purchase Agreement.

On May 1, 2007, Escrow & Title Services, LLC ("the Title Company") provided Exproman with title commitments for the Phase 1 Property and for the Phase 2 Property ("March 2007 Title Commitments"), both of which had an effective date of March 6, 2007. On May 14, 2007, Exproman sent a letter to Flynn Creek and its attorney, listing various objections to the 2007 Title Commitment for the Phase 2 Property ("May 2007

11

Objection Letter") "[p]ursuant to Section 4(b) of the Purchase Agreement[.]"[7]   (App. 162).   Flynn Creek provided no notice to Exproman that it was unable to cure these objections; thus, pursuant to Section 4(b) of the Purchase Agreement, Flynn Creek was "deemed" to have "elected to cure" the objections "to the satisfaction of" Exproman. (App. 103).

Also in May 2007, Exproman received the results of a wetlands study, which indicated that there were wetlands on the Phase 2 Property.  The wetlands consisted of two areas, one measuring 0.02 acres and the other measuring 0.09 acres.

On June 5, 2007, Exproman and Metro Holdings entered into an "Assignment and Assumption Agreement" ("Second Assignment") wherein Exproman assigned all its rights and interests to the Purchase Agreement to Metro Holdings, who assumed all of Exproman's obligations under the Purchase Agreement.[8]

On June 18, 2007, Flynn Creek and Metro Holdings held a closing on the Phase 1 Property.  After the closing on the Phase 1 Property, Metro Holdings built a 1,119,195 square-foot building, which it finished in December 2007 and leased to Quaker for use as a Gatorade distribution facility.  Apparently the lease included an option for Quaker to later expand the lease to the Phase 2 Property where Metro would build an expansion onto the distribution facility for Quaker's use.  As Metro Holdings was constructing the

---

[7] Exproman also sent an objection letter to the Title Commitment for the Phase 1 Property, but those objections are not at issue in this appeal.

[8] This Second Assignment was signed by Reardon as President of Exproman for the assignor and as Manager of Metro Holdings for the assignee.

facility on the Phase 1 Property, it moved 60,000 cubic yards of dirt from the Phase 1 Property onto the Phase 2 Property for later use as fill dirt.[9]

As for the closing on the Phase 2 Property, the Purchase Agreement set the closing date on Phase 2 Property for March 30, 2010; however, it also contained a provision that the closing date could be extended to March 30, 2011 and to March 30, 2012 for a specified extension fee. Metro Holdings ultimately paid the two separate extension fees and twice extended the closing date. Pursuant to the terms of the Purchase Agreement, Metro Holdings paid Flynn Creek $45,000.00 to extend the March 2010 closing date to March 2011 and $65,000.00 to extend the March 2011 closing date to March 2012. The Purchase Agreement made no provision to extend the closing date on the Phase 2 Property past March 30, 2012.[10] When Metro Holdings paid the extension fees, it did not mention any title or wetland issues with the Phase 2 Property.

At the end of 2011, Quaker apparently informed Metro Holdings that it was not going to exercise its option to expand the distribution facility onto the Phase 2 Property.

On February 24, 2012, the Title Company provided Metro Holdings with an updated title commitment for the Phase 2 Property ("2012 Updated Title Commitment"), which had an effective date of February 22, 2012. Then, on March 27, 2012, Metro Holdings received a final updated title commitment.

---

[9] In order to move the dirt onto the Phase 2 Property, Metro entered into a "Dirt Storage Agreement" with Flynn Creek in September 2007.

[10] Specifically, the Purchase Agreement provided that the "Purchaser shall purchase the [Phase 2 Property] on or before March 30, 2012, and Purchaser shall provide a notice to Seller of Purchaser's intent to purchase the [Phase 2 Property] ("Purchaser's Notice") in accordance with Section 8 herein." (App. 98).

On the day of the scheduled March 30, 2012 closing on the Phase 2 Property, Metro Holdings's attorney faxed a letter to Flynn Creek and its attorney ("Metro's March 30, 2012 Notice Letter"). In this letter, Metro Holdings asserted that Flynn Creek had not met certain closing conditions as required by the Purchase Agreement. Specifically, the letter provided as follows:

> Pursuant to Section 9 of the Purchase Agreement, Purchaser hereby notifies Seller that the Closing Conditions referenced in Sections 8(b) and 8(f) do not exist at and are not satisfied as of the Closing Date for the [Phase 2 Property]. Therefore, pursuant to Section 9(c) of the Purchase Agreement, Seller shall have sixty (60) days after the date hereof to satisfy such Closing Conditions.

(Appellee's App. 1338). Metro Holdings made no mention of any problem with wetlands.

That same day, Flynn Creek went to the title company for the scheduled closing and took a deposition of a title agent to establish that it was ready to close on the Phase 2 Property. Thereafter, Flynn Creek sent a letter ("Flynn Creek's March 30, 2012 Notice of Default") to both Metro Holdings and Quaker, asserting as follows:

> This is to provide the Purchaser with notice under Section 14 of the Purchase Agreement that Purchaser has defaulted in the performance of its obligation under the Purchase Agreement concerning its failure to purchase the [Phase 2 Property] pursuant to the "Phase 2 Closing" on or before March 30, 2012. Seller reserves all of its rights and remedies under the Purchase Agreement and applicable law.

(Appellee's App. 1114).

On April 3, 2012, Metro Holdings sent Flynn Creek a letter, indicating that it was going to terminate the Purchase Agreement because of the presence of wetlands on the

14

Phase 2 Property ("Metro's April 2012 Termination Letter"). Metro Holdings's letter

provided as follows:

> Pursuant to Section 4 "Conditions of Performance" of the Purchase Agreement, Purchaser's obligations under the Purchase Agreement, including its obligation to purchase the [Phase 2 Property], are contingent on the timely satisfaction of each of the conditions precedent more particularly described in Section 4 or the waiver of each by Purchaser, in writing. Purchaser did not complete the wetlands delineation survey referenced in Section 4(e) of the Purchase Agreement until May 1, 2007 ("the Wetlands Delineation Study"). Therefore, the condition precedent set forth in Section 4(e) of the Purchase Agreement was neither completed and satisfied nor completed or satisfied on or before April 15, 2007, and Purchaser has not waived such condition precedent, in writing or otherwise.

> As set forth in the Wetlands Delineation Study (a copy of the first five (5) pages thereof is attached for your reference), Purchaser discovered that wetlands do exist on the Real Estate, more specifically, they exist on the [Phase 2 Property]. Pursuant to the second sentence of Section 4(e), Purchaser hereby elects to terminate the Purchase Agreement and receive an immediate return of the earnest money, together with any interest earned thereon (collectively, the "Refund Amount"). Please instruct the Title Company to immediately wire transfer the Refund Amount to Purchaser[.]

(App. 205-06; Appellee's App. 1344-45).[11]

On April 9, 2012, Flynn Creek sent Metro Holdings a letter, acknowledging

receipt of Metro's March 30, 2012 Notice Letter and Metro's April 2012 Termination

Letter and indicating that the two letters were inconsistent. In its letter, Flynn Creek

disputed that Sections 8(b) and 8(f) were not satisfied and indicated that it "remain[ed]

ready, willing and able to close" on the Phase 2 Property. (App. 215).

The following day, on April 10, 2012, Flynn Creek filed a complaint against

Metro Holdings, Exproman, and Quaker, alleging that Metro had breached the Purchase

---

[11] We note that this letter was contained in one of the not-for-public-access volumes of Appellants' Appendix and placed on green paper but was contained in a regular volume of Appellee's Appendix and placed on white paper.

Agreement by failing to purchase the Phase 2 Property. In its complaint, Flynn Creek sought specific performance of the Purchase Agreement and noted that the Purchase Agreement contained a provision that specific performance could be granted to Flynn Creek, as seller, if Metro, as purchaser, defaulted in its performance under the Purchase Agreement. Alternatively, Flynn Creek sought damages for Metro's alleged breach of contract. Specifically, Flynn Creek sought damages for "the full purchase price that was to be paid by [Metro] under the Purchase Agreement on March 30, 2012." (Appellee's App. 1068). Flynn Creek also sought, pursuant to terms of the Purchase Agreement, interest and reasonable attorney fees.

Thereafter, on May 30, 2012, Metro Holdings sent the following letter to Flynn Creek and its attorney ("Metro's May 2012 Termination Letter"):

> As you know, the parties are in litigation with respect to the Purchase Agreement, and the parties' respective positions and actions may be subject to judicial challenge. As you also know, by letter dated April 3, 2012, Purchaser terminated the Purchase Agreement as a result of the failure of the Conditions of Performance set forth in Section 4(e) of the Purchase Agreement. Without waiving the efficacy of the termination on the grounds set forth in that letter, Purchaser hereby provides additional and independent grounds for termination of the Purchase Agreement.
>
> On March 30, 2012, pursuant to Section 9 of the Purchase Agreement, Purchaser notified Seller that the Closing Conditions referenced in Section 8(b) and 8(f) of the Purchase Agreement did not exist at and were not satisfied as of the Closing Date for the [Phase 2 Property]. Therefore, pursuant to Section 9(c) of the Purchase Agreement, as amended in the Addendum to Real Estate Purchase Agreement dated March 12, 2007 [Addendum #1], Purchaser notified Seller that it had sixty (60) days to satisfy the Closing Conditions.
>
> The sixty-day cure period expired yesterday, May 29, 2012, and Seller has failed or refused to satisfy the deficient Closing Conditions. Accordingly, pursuant to Section 9(c) of the Purchase Agreement,

16

Purchaser hereby notifies Seller that the Purchase Agreement is hereby terminated for failure of Closing Conditions 8(b) and 8(f) and demands that Seller return to Purchaser the Earnest Money ($250,000.00) and any Extension Fees ($110,000.00), together with any interest earned thereon (the "Refund Amount").

For the reasons set forth in this termination notice, please instruct the Title Company to immediately wire transfer the Refund Amount to Purchaser.

(App. 217-18; Appellee's App. 1340, 1342).[12]

On June 18, 2012, Metro filed a counterclaim against Flynn Creek and later filed an amended counterclaim on February 21, 2013. In its amended counterclaim, Metro raised two counts, both alleging that Flynn Creek had breached the Purchase Agreement. In its first breach of contract count, Metro argued that Flynn Creek had breached the Purchase Agreement by failing to return the earnest money and extension fees after Metro had terminated the Purchase Agreement under Sections 4(e) and 9, and it sought the return of $250,000.00 in earnest money and $110,000.00 in extension fees plus attorney fees and costs. In the second count, Metro argued that Flynn Creek had breached under paragraph eight of Addendum #1 to the Purchase Agreement because Flynn Creek had sued Quaker without first exhausting all of its legal rights and remedies against Metro.[13]

---

[12] We note that this letter was contained in one of the not-for-public-access volumes of Appellants' Appendix and placed on green paper but was contained in a regular volume of Appellee's Appendix and placed on white paper.

[13] As for Quaker's involvement in the lawsuit, Quaker filed a motion to dismiss Flynn Creek's complaint, which was denied by the trial court. Thereafter, Quaker filed a counterclaim against Flynn Creek and a cross-claim for indemnity against Metro Holdings and Exproman. Flynn Creek then filed a motion to dismiss Quaker's counterclaim, which the trial court denied. Quaker then filed a motion for a separate trial, which the trial court granted.

17

Thereafter, Flynn Creek and Metro filed cross-motions for summary judgment, responses to each other's cross-motions for summary judgment, and replies in support of their respective motions for summary judgment. As part of the summary judgment proceedings, both Metro and Flynn Creek filed motions to exclude certain documents from public access and requested that they be filed under seal. The trial court granted both parties' motions to exclude.

In Flynn Creek's motion for summary judgment, it asserted that it was entitled to summary judgment on its claim of specific performance and on the first count of Metro's breach of contract counterclaim. Flynn Creek argued that Metro had breached the Purchase Agreement because it did not purchase and close on the Phase 2 Property on March 30, 2012. Flynn Creek focused the majority of its summary judgment argument on its contention that Metro had breached the contract by improperly terminating the Purchase Agreement on April 3, 2012. Flynn Creek asserted that Metro's asserted reason for terminating the Purchase Agreement (i.e., the presence of wetlands) was not timely raised under the terms of the Purchase Agreement. Flynn Creek further claimed that Metro was barred, by the doctrines of laches and estoppel, from terminating the Purchase Agreement based on the presence of wetlands. In regard to a remedy, Flynn Creek contended that it was entitled to specific performance based on Metro's breach, whether or not it had an adequate remedy at law. Flynn Creek asserted that it was entitled to specific performance because the parties included language in the Purchase Agreement—specifically, Section 14—that allowed Flynn Creek the option to seek the remedy of specific performance.

18

As for Metro's cross-motion for summary judgment, Metro sought summary judgment on Count 1 of its counterclaim against Flynn Creek and "[a]lternatively" sought partial summary judgment on Flynn Creek's specific performance claim. (App. 36). As it did in its amended complaint, Metro argued that Flynn Creek had breached the Purchase Agreement by failing to return Metro's earnest money and extension fees. Additionally, Metro asserted that Flynn Creek had failed to satisfy certain closing conditions—specifically, the conditions set out in Sections 8(b) and 8(f)—contained in the Purchase Agreement,[14] which it asserted were conditions precedent to Metro's obligation to purchase and close on the Phase 2 Property on March 30, 2012. Metro also argued that Flynn Creek had "anticipatorily repudiated" its obligations under the Purchase Agreement on March 30, 2012 by holding a purported closing on the Phase 2 Property after Metro informed it of the unsatisfied closing conditions and then by insisting on Metro's performance despite the allegation that Flynn Creek had failed to satisfy the closing conditions. (App. 37). In other words, Metro argued that Flynn Creek repudiated its obligations under the Purchase Agreement, which in turn, extinguished Metro's obligation under the Purchase Agreement to purchase the Phase 2 Property.

---

[14] Metro argued that Flynn Creek had failed to satisfy Sections 8(b) and 8(f), both of which required Flynn Creek to ensure that the Title Company was prepared to issue a title policy for the Phase 2 Property that was in conformity with the Title Commitment. Metro asserted that Flynn Creek failed to satisfy Section 8(b) because the 2012 Updated Title Commitment was "materially different" than the 2007 Title Commitment (i.e., the inclusion of "Special Exception 7" regarding an exclusion of title insurance coverage for public roads to the real estate) and that Flynn Creek would not have been able to ensure that the title policy was in conformity with the 2007 Title Commitment. (App. 54). Additionally, Metro asserted that Flynn Creek had failed to satisfy Section 8(f) because there was a "Later Title Objection," which was not permitted under the Purchase Agreement. More specifically, Metro contended that there was a county road (CR 1075 E) running along the Phase 2 Property that was apparently or mistakenly not entirely vacated.

Metro also argued that, even in the event that the trial court were to deny its summary judgment motion, it was entitled to summary judgment on Flynn Creek's equitable specific performance claim because the designated evidence "conclusively establishe[d]" that Flynn Creek, as a real estate vendor, had an adequate remedy at law (i.e., "money damages") and, thus, was not entitled to specific performance. (App. 37). Metro argued that Flynn Creek had an adequate remedy at law because it could sell the Phase 2 Property and recover the money damages for the difference between the current market value or sale price and the amount that Metro would have paid under the Purchase Agreement.[15] Additionally, Metro argued that Flynn Creek was not entitled to specific performance because it had failed to establish that it was in substantial compliance with the precise terms of the Purchase Agreement.[16] Metro acknowledged that Section 14 of the Purchase Agreement allowed Flynn Creek to seek specific performance, but it argued that Flynn Creek still needed to meet its burden on summary judgment to establish the elements necessary to obtain such relief.

On March 20, 2013, the trial court held a hearing on the cross-motions for summary judgment. During the hearing, Metro requested the trial court to enter findings and conclusions pursuant to Trial Rule 52.

---

[15] Metro asserted that Flynn Creek had received an unsolicited offer for the Phase 2 Property.

[16] Metro argued that Flynn Creek could not show that it had substantially complied with closing conditions 8(b) and 8(f). In Metro's response in opposition to Flynn Creek's summary judgment motion, Metro added another argument of why Flynn Creek could not show that it had substantially complied with the terms of the Purchase Agreement; this time, Metro argued that Flynn Creek had failed to comply with the closing conditions because a county road had not been fully vacated.

On May 13, 2013, the trial court entered findings of fact and conclusions thereon and then entered final judgment pursuant to Trial Rule 54(B) in favor of Flynn Creek. Specifically, the trial court concluded that Metro had breached the Purchase Agreement by failing to purchase the Phase 2 Property on March 30, 2012. The trial court concluded, in part, that Metro could not rely on its attempt to terminate the Purchase Agreement on April 3, 2012 as a justification for not purchasing the Phase 2 Property. The trial court determined the termination was not proper under the plain language of Section 4(e) of the Purchase Agreement because Metro had failed to comply with this section's requirement that it procure the wetlands study *and* provide written notice of the termination to Flynn Creek prior to the end of the Due Diligence Period (April 15, 2007). The trial court also concluded that Metro's reliance on its April 3, 2012 termination notice was barred by laches and estoppel.

Thus, the trial court granted Flynn Creek's motion for summary judgment on its claims of breach of contract and specific performance; ordered Metro to "specifically perform and purchase the Phase II property in accordance with the Purchase Agreement within thirty (30) days[;]" denied Metro's motion for summary judgment in its entirety; entered judgment against Metro and in favor of Flynn Creek on Count I of Metro's counterclaim; and, pursuant to the relevant provision of the Purchase Agreement, awarded reasonable attorney fees, costs, and interest to Flynn Creek.[17]

---

[17] The trial court then set the attorney fee issue for a hearing. The trial court later entered an order temporarily staying the attorney fee issue and hearing pursuant to an agreed order submitted by the parties.

Thereafter, on May 29, 2013, Metro filed a motion to correct error and a motion to stay the judgment. In its motion to correct error, Metro argued that the trial court had erred by granting summary judgment on Flynn Creek's claim for specific performance and requested the trial court to vacate its summary judgment order in favor of Flynn Creek on its breach of contract claim.

While Metro's motion to correct error was pending, Quaker commenced an appeal.[18] (*See* Docket for *Quaker Sales & Distribution v. Flynn Creek Partners, LLC*, Appellate Cause 32A05-1306-PL-279). On June 12, 2013, Quaker filed, with this Court, both a notice of appeal and a motion to remand pursuant to Appellate Rule 37(A). On June 17, 2013, this Court granted Quaker's motion to remand, dismissed Quaker's appeal without prejudice, and remanded to the trial court for further proceedings. This Court's order also provided that "if any of the trial court's forthcoming ruling is adverse" to Quaker, then Quaker could file "a new notice of appeal [and] raise the issues it would have raised in this appeal along with any new issues created by the trial court on remand." (*See* Docket for *Quaker Sales & Distribution v. Flynn Creek Partners, LLC*, Appellate Cause 32A05-1306-PL-279).

On July 12, 2013, the trial court held a hearing on Metro's motion to correct error and motion to stay the judgment.[19] Subsequently, on August 8, 2013, the trial court entered an order denying Metro's motion to correct error and granting its motion to stay

---

[18] The record on appeal does not reveal the order that Quaker was appealing.

[19] According to the chronological case summary, Quaker was not present at this July hearing.

the judgment pending appeal. In its order, the trial court also ruled that "[a]ll other requests for relief not specifically ordered herein [were] deemed denied." (App. 35).

On September 3, 2013, Metro filed a notice of appeal and commenced this appeal under appellate cause number 32A01-1309-PL-374 ("Cause 374"). Thereafter, on September 5, 2013, Quaker filed a notice of appeal and commenced a separate appeal under appellate cause number 32A01-1309-PL-376 ("Cause 376").[20] On September 24, 2013, Metro filed a motion to consolidate Quaker's appeal with Metro's appeal. On September 27, 2013, this Court granted Metro's consolidation motion and transferred all filings from Cause 376 to Cause 374 and ordered that Cause 376 be closed. Quaker, however, did not filed an appellate brief nor did it file any pleading indicating that it was joining in Metro's appellate arguments. We now turn to Metro's appellate arguments.[21]

## DECISION

Metro appeals the trial court's order granting Flynn Creek's motion for summary judgment and denying Metro's cross-motion for summary judgment in this contract action.

Where a trial court enters specific findings and conclusions when granting a motion for summary judgment, as the trial court did in this case, the entry of specific

---

[20] In its notice of appeal, Quaker indicated that it was appealing the trial court's May 13, 2013 summary judgment order and its August 8, 2013 order denying the motion to correct error.

[21] During the appellate briefing process, Metro filed a motion to exclude its Appendix Volumes V and VI from public access, and Flynn Creek filed a motion to exclude its Appendix Volume III from public access. Our Court granted Flynn Creek's motion and granted Metro's motion in part, indicating that Metro could exclude public access to the documents in Appendix V and VI that the trial court had already deemed to be confidential. Additionally, Metro filed a motion for oral argument, which we deny by separate order entered contemporaneously with the handdown of this opinion.

conclusions does not alter the nature of our review. *Rice v. Strunk*, 670 N.E.2d 1280, 1283 (Ind. 1996). We are not bound by the trial court's specific conclusions of law. *Id.* They merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.*

When reviewing a trial court's order denying summary judgment, we apply the same standard as that used in the trial court. *Kopczynski v. Barger*, 887 N.E.2d 928, 930 (Ind. 2008). Summary judgment is appropriate only where the designated evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). The moving party "bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." *Gill v. Evansville Sheet Metal Works, Inc.*, 970 N.E.2d 633, 637 (Ind. 2012). "[T]he party seeking summary judgment has the initial burden of proving the absence of a genuine issue of material fact as to an outcome-determinative issue. Only then must the non-movant come forward with contrary evidence demonstrating the existence of genuine factual issues that should be resolved at trial." *Kroger Co. v. Plonski*, 930 N.E.2d 1, 9 (Ind. 2010) (citing *Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 123 (Ind. 1994), *reh'g denied*). "Like the trial court, we construe all evidence and resolve all doubts in favor of the non-moving party, so as to avoid improperly denying him his day in court." *Miller v. Dobbs*, 991 N.E.2d 562, 564 (Ind. 2013) (internal citation omitted).

"To prevail on a claim for breach of contract, the plaintiff must prove the existence of a contract, the defendant's breach of that contract, and damages resulting

24

from the breach." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). The parties do not dispute that the Purchase Agreement was an enforceable contract. Instead, they both moved for summary judgment, alleging that the other party had defaulted under or breached certain provisions of the Purchase Agreement. Thus, this summary judgment turns, in part, on contract interpretation and the meaning of certain provisions of the Purchase Agreement.

"Summary judgment is especially appropriate in the context of contract interpretation because the construction of a written contract is a question of law." *TW Gen. Contracting Servs., Inc. v. First Farmers Bank & Trust*, 904 N.E.2d 1285, 1287–88 (Ind. Ct. App. 2009) (citing *Colonial Penn Ins. Co v. Guzorek*, 690 N.E.2d 664, 667 (Ind. 1997)), *reh'g denied.* "The ultimate goal of any contract interpretation is to determine the intent of the parties when they made the agreement." *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012), *reh'g denied.* To do so, "we begin with the plain language of the contract, reading it in context and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole." *Id.* A court should construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Hammerstone v. Ind. Ins. Co.*, 986 N.E.2d 841, 846 (Ind. Ct. App. 2013).

Here, the trial court found, and the parties do not dispute, that the language of the Purchase Agreement was unambiguous. When the language of a contract is unambiguous, we may not look to extrinsic evidence to add to, vary, or explain the instrument but must determine the parties' intent from the four corners of the instrument.

25

*Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006). "[C]onstruction of the terms of a written contract is a pure question of law for the court, reviewed de novo." *Harrison v. Thomas*, 761 N.E.2d 816, 818 (Ind. 2002). "We will reverse a summary judgment based on the interpretation of a contract if the trial court misapplies the law." *Bhd. Mut. Ins. Co. v. Michiana Contracting, Inc.*, 971 N.E.2d 127, 131 (Ind. Ct. App. 2012), *reh'g denied*, *trans. denied*.

We are called upon to determine whether the trial court properly granted summary judgment in this contract dispute between two sophisticated business entities. The crux of this case is whether Metro breached the terms of the Purchase Agreement, and if so, whether Flynn Creek is entitled to seek specific performance for that breach.

On appeal, Metro primarily challenges the trial court's determination that Flynn Creek was entitled to specific performance, secondarily challenges the trial court's determination that Metro breached the Purchase Agreement, and then makes a tertiary challenge to the trial court's determination that Flynn Creek did not repudiate the Purchase Agreement. We, however, will review each issue in logical order.

Breach

We will first address Metro's argument that the trial court erred by granting summary judgment on Flynn Creek's breach of contract claim against Metro.

It is undisputed that, pursuant to the terms of the Purchase Agreement, Metro (as assignee purchaser) had an obligation to purchase and close on the Phase 2 Property by March 30, 2012. It is also undisputed that Metro did not purchase the Phase 2 Property by or on March 30, 2012. Instead, Metro sent a letter—Metro's March 30, 2012 Notice

26

Letter—invoking Section 9 of the Purchase Agreement, informing Flynn Creek that it had failed to satisfy certain closing conditions, and telling Flynn Creek that it had sixty days to satisfy these conditions. Three days later, Metro sent another letter—Metro's April 2012 Termination Letter—stating that it was terminating the Purchase Agreement under Section 4 of the Purchase Agreement because there were wetlands on the Phase 2 Property and because Metro, itself, had failed to comply with a condition precedent of the Purchase Agreement when it did not complete a wetlands survey prior to the Due Diligence Period of April 15, 2007.

As it did on summary judgment, Flynn Creek focuses on Metro's breach by attempting to terminate the Purchase Agreement and contends that Metro's attempt to terminate the Purchase Agreement based on the presence of wetlands and its refusal to purchase the Phase 2 Property constituted a breach because it was contrary to the plain language of the Purchase Agreement.[22]

Section 4(e) of the Purchase Agreement contained the following provision addressing Metro's ability to terminate the agreement based on the presence of wetlands:

> 4. **Conditions of Performance**. All of the items in this Section 4 shall be completed and/or satisfied on or before [April 15,] 2007 (the "Due Diligence Period"), and Purchaser's obligations under this Agreement shall be contingent upon the timely and complete satisfaction of the following conditions precedent or waiver thereof by Purchaser, in writing:
>
> * * * * *
>
> (e) <u>Wetlands Delineation Study</u>. Purchaser, at its cost and expense, may conduct or have conducted any wetland delineation study of the

---

[22] Flynn Creek contends that it is unnecessary to review whether Metro's March 30, 2012 letter constituted a breach if this Court determines that Metro improperly terminated the Purchase Agreement on April 3, 2012. The trial court's order addressing the breach claim focuses primarily on the April 2012 termination, and so too will we.

Real Estate, to determine whether there are any wetlands on the Real Estate under the jurisdiction of the Army Corps of Engineers. In the event that wetlands are discovered on the Real Estate, at Purchaser's election, this agreement shall terminate and Purchaser shall receive an immediate refund of the earnest money, together with any interest earned thereon, or Purchaser may proceed with the purchase and receive a reduction of the per acre price to the extent of any delineated wetlands located on the [Phase 2 Property].

In the event Purchaser terminates this Agreement by written notice to Seller prior to the expiration of the Due Diligence Period, Purchaser shall receive an immediate refund of the Earnest Money together with any interest earned thereon.

(App. 102, 104).

The trial court determined, based on the plain language of this provision, that Metro had breached the Purchase Agreement when it attempted to terminate the agreement based on the presence of wetlands and avoid its obligation to purchase the Phase 2 Property. The trial court made the following relevant conclusions regarding Metro's breach:

4.   Metro procured the wetlands report too late to be able to object to the closing on the Phase II property based on wetlands, and then was too late in notifying Flynn Creek of the alleged wetlands to avoid closing based on wetlands. The plain language of the Purchase Agreement required Metro to conduct the wetlands study before April 15, 2007 if it chose to conduct a wetlands study as part of its due diligence. If Metro did so, and certain wetlands were discovered on the Real Estate that made Metro wish to terminate the Purchase Agreement, Metro was then required to provide written notice of termination to Flynn Creek "prior to the expiration of the Due Diligence Period," i.e., April 15, 2007. Here Metro failed to do either. Metro did not conduct the wetlands Due Diligence before April 15, 2007 (the wetlands report was not even ordered until April 24, 2007 and then not delivered until late May, 2007). Nor did Metro then provide written notice of an objection based on the wetlands consultant's report before the expiration of the Due Diligence Period, April 15, 2007. The first written notice by Metro to Flynn Creek that it sought to terminate the Purchase Agreement due to wetlands was on April 3, 2012.

28

7.    Metro's inaction prevents Metro from terminating the Purchase Agreement based upon a wetlands report Metro had in its possession and had internally discussed since May 2007.  Metro's inaction worked to the detriment of Flynn Creek, who continued to hold the Phase II property for Metro, while Flynn Creek was led to believe that Metro would close on the Phase II property by March 30, 2012.  Flynn Creek did not have independent knowledge of the alleged wetlands on the Phase II property prior to April 3, 2012 until Metro finally advised Flynn Creek of the potential wetlands and terminated on that date.

8.    The plain language of Section 4(e) of the Purchase Agreement does not allow Metro to terminate only the purchase of the Phase II property if wetlands are located on the Phase II property, but rather Metro can only terminate the entire Purchase Agreement, or alternatively, Metro may proceed and receive a reduction of the per acre price.  Metro's action in terminating the Phase II purchase only, instead of proceeding with a price reduction, is contrary to the express language of the Purchase Agreement.

(App. 11-14).

Based on the plain language of the Purchase Agreement, we agree with the trial court's conclusion that Metro could not rely on its attempt to terminate the Purchase Agreement on April 3, 2012 as a justification for not purchasing the Phase 2 Property.  Indeed, the plain language of Section 4(e) of the Purchase Agreement required Metro to procure the wetlands study <u>and</u> provide written notice of the termination to Flynn Creek prior to the end of the Due Diligence Period (April 15, 2007) in order to terminate the Purchase Agreement based on wetlands.  Metro did not do so.

Furthermore, as Flynn Creek correctly asserts, "Metro implicitly concedes it breached the Purchase Agreement by terminating the contract on April 3, 2012 based on possible wetlands" because Metro did not specifically challenge the trial court's ruling on appeal.  We agree with Flynn Creek.  Metro, in its initial appellate brief, does not directly

29

challenge the trial court's conclusion that Metro's attempt to terminate the Purchase Agreement based on the presence of wetlands on April 3, 2012 constituted a breach. Instead, Metro asserts that the "wetlands issue" was "not relevant" to summary judgment. (Metro's Br. 39). Metro contends that "even if Metro's April 3 termination letter based upon wetlands could be construed as a breach of contract on the part of Metro," such breach would be "irrelevant" because Flynn Creek breached first and, therefore, Metro's attempt to terminate was merely a "subsequent breach[.]" (Metro's Br. 40). Metro argues that Flynn Creek repudiated the Purchase Agreement when it sent its March 30, 2012 letter—in which Flynn Creek notified Metro that it had defaulted under the Purchase Agreement by not purchasing the Phase 2 Property and invoked its rights and remedies under Section 14 of the Purchase Agreement based on Metro's default—and contends that "Metro's obligations under the Purchase Agreement were discharged the moment Flynn Creek repudiated." (Metro's Br. 39). In other words, Metro attempts to deflect the blame for its failure to purchase the Phase 2 Property from itself and, instead, divert the blame to Flynn Creek by arguing that Flynn Creek repudiated the Purchase Agreement.

"Repudiation of a contract must be positive, absolute, and unconditional in order that it may be treated as an anticipatory breach." *Angelone v. Chang*, 761 N.E.2d 426, 429 (Ind. Ct. App. 2001). "Because the doctrine of anticipatory repudiation represents a harsh remedy, the requirement that the repudiating statement be clear and absolute is a strict one." *Id.* Indeed, "[w]here two contracting parties differ as to the interpretation of a contract or as to its legal effects, an offer to perform in accordance with his own

30

interpretation made by one of the parties is not in itself an anticipatory breach." *Eden United, Inc. v. Short*, 573 N.E.2d 920, 929 (Ind. Ct. App. 1991) (quoting A. CORBIN, CORBIN ON CONTRACTS § 973 at 961-62 (One Vol. Ed. 1952)), *reh'g denied*, *trans. denied*.

The trial court rejected Metro's argument and determined that Flynn Creek's had not repudiated or anticipatorily breached the Purchase Agreement. Specifically, the trial court concluded:

> 12. Flynn Creek's actions on March 30, 2012 including attending and transcribing the scheduled March 30, 2012 closing and Flynn Creek's March 30, 2012 letter to Metro reserving all of its rights and remedies under the Purchase Agreement does not constitute anticipatory repudiation under Indiana law. It is clear that Metro itself did not treat Flynn Creek's actions on March 30, 2012 as anticipatory repudiation because only four (4) days later Metro terminated the Purchase Agreement. These actions are inconsistent with the position or belief that Flynn Creek had anticipatorily repudiated the Purchase Agreement earlier on March 30, 2012.

(App. 29).

We agree with the trial court's conclusion. The designated evidence reveals that after Metro gave its last minute notice that it was not going to attend the closing and purchase the Phase 2 Property, Flynn Creek notified Metro that it had defaulted and—invoking Section 14 of the Purchase Agreement—stated that it was reserving its rights and remedies for such default. Metro, as summary judgment movant on this repudiation claim, has not shown that such action constituted a clear or absolute statement that Flynn Creek was repudiating or anticipatorily breaching the Purchase Agreement. Indeed, the record tends to show that Flynn Creek was acting pursuant to the terms of the Purchase Agreement.

31

Here, the terms of the Purchase Agreement required Metro to purchase the Phase 2 Property by March 30, 2012. Metro failed to do so and then improperly attempted to terminate the Purchase Agreement. Based on these actions, the trial court concluded that Metro had breached its contract with Flynn Creek and then granted summary judgment to Flynn Creek and denied Metro's cross-motion for summary judgment. Because Metro has not shown that the trial court erred, we affirm the trial court's grant of summary judgment to Flynn Creek on its breach of contract claim and the trial court's denial of summary judgment to Metro on its anticipatory breach claim.

Specific Performance

Metro contends that the trial court erred by granting summary judgment to Flynn Creek on its claim for specific performance.

"The grant of specific performance directs the 'performance of a contract according to the precise terms agreed upon, or substantially in accordance therewith.'" *Salin Bank & Trust Co. v. Violet U. Peden Trust*, 715 N.E.2d 1003, 1007 (Ind. Ct. App. 1999) (quoting *Strauss v. Yeager*, 48 Ind.App. 448, 460, 93 N.E. 877, 882 (1911)), *trans. denied*. In regard to our review of a trial court order of specific performance, we have explained that:

> The decision whether to grant specific performance is a matter within the sound discretion of the trial court. The judgment of the trial court is given deference because an action to compel specific performance sounds in equity. It is a matter of course for the trial court to grant specific performance of a valid contract for the sale of real estate. To be enforced by specific performance, a contract for the sale of real estate need only be reasonably definite and binding as to its material terms. A party seeking specific performance of a real estate contract must prove that the contract

32

obligations of that party have been substantially performed or that an offer to do so has been made.

*Humphries v. Ables*, 789 N.E.2d 1025, 1034 (Ind. Ct. App. 2003) (internal citations omitted).

Here, the Purchase Agreement contained the following provision addressing Flynn Creek's ability to obtain specific performance:

> 14.   **Purchaser's Default After Phase 1 Closing**.   IF, AFTER THE PHASE 1 CLOSING, PURCHASER DEFAULTS IN THE PERFORMANCE OF ITS OBLIGATIONS UNDER THIS AGREEMENT WITH RESPECT TO THE PURCHASE OF THE [Phase 2 Property] AND FAILS TO CURE SUCH DEFAULT WITHIN TEN (10) DAYS AFTER WRITTEN NOTICE FROM SELLER TO PURCHASER SPECIFYING SUCH DEFAULT, SELLER MAY SEEK ANY REMEDY PROVIDED BY EQUITY OR LAW, INCLUDING *THE RIGHT OF SPECIFIC PERFORMANCE*, OR TERMINATE THIS AGREEMENT AND RECEIVE THE EARNEST MONEY AS LIQUIDATED DAMAGES.

(App. 109) (capitalization in original) (emphasis added).  In its summary judgment order, the trial court made the following conclusions regarding specific performance:

> 17.   Specific performance may be ordered for a seller of real estate.  *Humphries v. Ab[le]s*, 789 N.E.2d 1025, 1034 (Ind. [Ct.] App. 2003); *Migatz v. Stieglitz*, 166 Ind. 361, 77 N.E. 400 (1906).  Specific performance is not only limited to purchasers of real estate.  *Id.*

> 18.   Specific performance may also be ordered notwithstanding that damages could be awarded to the party seeking specific performance. *Humphries*, 789 N.E.2d at 1034 and 1036 n.11; *Walcis v. Kozacik*, 156 N.E. 589 (Ind. [Ct.] App. 1927).

> 19.   Whether to order specific performance is a matter for this Court's sound discretion.  *Kessler* [sic] *v. Marshall*, 792 N.E.2d 893, 897 (Ind. [Ct.] App. 2003)[, *reh'g denied*, *trans. denied*].

> 20.   Paragraph 14 of the Purchase Agreement states in capital letters that Flynn Creek "may seek any remedy provided by equity or law, *including the right of specific performance . . . .*"  The terms of this

33

provision are clear and unambiguous, and thus should be applied. *Stout*, 677 N.E.2d at 1064. When the contract at issues allows specific performance as the Purchase Agreement does in this instance specific performance may be applied. *Humphries*, 789 N.E.2d at 1035-36.

(App. 31-32) (emphasis in original).

Metro argues that the "trial court's threshold error was its conclusion that specific performance may be awarded to the seller of real estate 'notwithstanding that damages could be awarded to the party seeking specific performance.'" (Metro's Br. 18) (citing App. 31 at ¶ 18). Metro asserts that the trial court "departed from case law and equitable maxims that specific performance is not available where remedies at law are adequate[,]" and it cites to this Court's opinion in *Kesler*. (Metro's Br. 16).

Flynn Creek counters that the trial court properly granted it summary judgment on its claim for specific performance because it was permitted by both Indiana law and the Purchase Agreement. In regard to case law, Flynn Creek asserts that "[i]t has been the law for over 100 years that specific performance is available to sellers in real estate transactions." (Flynn Creek's Br. 37) (citing *Migatz*, 77 N.E. 400; *Humphries*, 789 N.E.2d 1025; and *Salin*, 715 N.E.2d 1003). Additionally, Flynn Creek argues the trial court's grant of specific performance was proper because the Purchase Agreement "explicitly identifies Flynn Creek's 'right of specific performance'" for the Phase 2 Property. (Flynn Creek's Br. 41).

Another panel of our Court has previously faced an argument similar to Metro's argument that specific performance is not available to a seller of real estate if the seller has an adequate remedy at law. In *Humphries*, the trial court, after a trial, ordered

34

specific performance of a contract against the buyers.  On appeal, the buyers argued that specific performance was not available as a remedy to a real estate vendor when the property could be resold.  The *Humphries* Court reviewed the case law regarding awarding specific performance to a vendor:

> It is true that the number of cases in Indiana in which a vendor has been awarded specific performance of a contract is rather small.  In addition to *Ridenour* [*v. France*, 442 N.E.2d 716 (Ind. Ct. App. 1982)], this court addressed the propriety of an award of specific performance to a vendor in *Salin Bank & Trust Co. v. Violet U. Peden Trust*, 715 N.E.2d 1003 (Ind. Ct. App. 1999), *trans. denied.*  At issue was whether the vendor was entitled to specific performance because she failed to complete her obligations according to the requirements set forth in an option to purchase certain real property.  This court determined that the vendor was effectively relieved of her performance of a condition of the contract because the purchaser had defectively performed its duty under the contract.  *Id.* at 1008.  Because the vendor had been relieved of her duty to perform under the contract, we held that the trial court was within its discretion in awarding specific performance of the contract to the vendor.  *Id.*

> One of the earliest cases to address whether a vendor could be awarded specific performance of a contract for the sale of real property was *Migatz v. Stieglitz*, 166 Ind. 361, 77 N.E. 400 (1906).  In awarding specific performance of a real estate contract to the vendor, our Supreme Court stated:

>> "The equitable doctrine is that the enforcement of contracts must be mutual, and, the vendee being entitled to specific performance, his vendor must likewise be permitted in equity to compel the acceptance of his deed and the payment of the stipulated consideration.  This remedy is available, although the vendor may have an action at law for the purchase money." 166 Ind. at 364, 77 N.E. at 401.

> We have found no law which changes this time honored principle. Indeed, vendors traditionally have qualified for the remedy of specific performance of a real estate contract after a purchaser's breach.  *See* 14 James H. Backman, POWELL ON REAL PROPERTY § 81.04[1][a] (2003). While the reasons for awarding specific performance to vendors may be less compelling than the reasons for awarding specific performance to

35

purchasers following a vendor's breach, the remedy is available nonetheless. *Id.*

*Humphries*, 789 N.E.2d at 1035. Additionally, the *Humphries* Court noted the importance of the fact that the parties had "agreed that specific performance was an acceptable and valid remedy" available to the vendor when they included terms in the contract regarding the vendors' option of seeking an "equitable" remedy. *Id.* at 1035-36. After explaining that "[c]ontracts, when entered into freely and voluntarily, w[ould] be enforced by the courts," the *Humphries* Court explained that it would "not invalidate a remedy for which the Sellers [had] contracted" and held that the trial court did not abuse its discretion by ordering specific performance of the contract. *Id.* at 1036.

Despite this case law, Metro relies on *Kesler*—which was decided after *Humphries*—to argue that specific performance was not available to Flynn Creek. In *Kesler*, the trial court, following a bench trial, granted specific performance of a real estate purchase agreement, ordering a buyer to purchase the real estate. On appeal, another panel of this Court held that the trial court's judgment that the seller was entitled to specific performance was "clearly erroneous" because the seller had not made the requisite showing that he had substantially performed the contract or had offered to do so. *Kesler*, 792 N.E.2d at 896. Additionally, the *Kesler* Court pointed out that "[o]ur courts generally will not exercise equitable powers when an adequate remedy at law exists" and explained that "[w]here substantial justice can be accomplished by following the law, and the parties' actions are clearly governed by rules of law, equity follows the law." *Id.* at 897. The Court then determined that "none of the [trial] court's findings support[ed] the

36

conclusion that monetary damages would be insufficient to fully compensate" the seller and stated that the seller "could have kept [the buyer's] earnest money and terminated the contract, or resold the property and held [the buyer] liable for the difference between the actual sale price and the price under the contract." *Id.* As a result, the *Kesler* Court held that "under these circumstances," the trial court abused its discretion by ordering the buyer to specifically perform the contract. *Id.* (citing to out-of-state case law).

Unlike *Kesler*, where there was no contract provision allowing for specific performance, here, the parties' Purchase Agreement included specific language providing that Flynn Creek had "the right" to specific performance. "'Indiana courts recognize the freedom of parties to enter into contracts and, indeed, presume that contracts represent the freely bargained agreement of the parties.'" *Haegert*, 977 N.E.2d at 937 (quoting *Fresh Cut Inc. v. Fazli*, 650 N.E.2d 1126, 1129 (Ind. 1995)). "[W]hen the terms of a contract are drafted in clear and unambiguous language, we will apply the plain and ordinary meaning of that language and enforce the contract according to those terms." *Id.* Thus, we must apply and enforce the terms of the Purchase Agreement to this summary judgment before us. *See id.*

Here, the terms of the parties' Purchase Agreement allowed for Flynn Creek, upon default by Metro, to choose a remedy at law or equity, and the parties agreed that Flynn Creek's equitable remedy included "the right" to specific performance. After Metro did not perform its obligation to purchase the Phase 2 Property, Flynn Creek chose to seek an equitable remedy and chose to assert its right to specific performance. We will not invalidate a remedy for which the parties have contracted. *See Humphries*, 789 N.E.2d at

1036. Based on the language contained in the four corners of the Purchase Agreement, we conclude that the trial court did not err by granting summary judgment to Flynn Creek on its claim for specific performance.[23]

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.

---

[23] If not for the specific language in the Purchase Agreement establishing a right to specific performance, Flynn Creek, as the summary judgment movant, would have been required to make the requisite showing to obtain specific performance as a matter of law. *See Humphries*, 789 N.E.2d at 1034 ("A party seeking specific performance of a real estate contract must prove that the contract obligations of that party have been substantially performed or that an offer to do so has been made."); *Gill*, 970 N.E.2d at 637 (explaining that the moving party on summary judgment "bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law"); *see also* Ind. Trial Rule 56(C).