**FOR PUBLICATION**



ATTORNEY FOR APPELLANT:

**JENNIFER E. DAVIS**
Bruce P. Clark & Associates
St. John, Indiana

ATTORNEY FOR APPELLEES:

**KEVIN W. MARSHALL**
Hobart, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| WESTFIELD NATIONAL INSURANCE COMPANY, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 64A03-1108-PL-345 |
| | ) | |
| CHARLOTTE NAKOA, WARREN E. RIGG, STEVEN L. RIGG, and LARRY D. RIGG, | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE PORTER SUPERIOR COURT
The Honorable William E. Alexa, Judge
Cause No. 64D02-0907-PL-7611

**February 10, 2012**

**OPINION – FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Westfield National Insurance Company ('Westfield') appeals the trial court's entry of judgment in favor of its insured, Charlotte Nakoa, in the amount of $233,214.57.[1] Nakoa cross-appeals the trial court's ruling on Westfield's motion to correct error that reduced the original judgment by $10,200.[2] We affirm.

**Issues**

The sole restated issue raised by Westfield is whether the trial court erred in concluding that it had waived its right to insist that Nakoa comply with certain alleged conditions precedent in order to receive replacement cost coverage for the loss of her home, as opposed to actual cash value coverage. Nakoa cross-appeals the trial court's determination that Nakoa was not entitled to coverage for the loss of use of the home.

**Facts**

On January 26, 2008, fire destroyed a home in Valparaiso co-owned and occupied, at least part-time, by Nakoa. Westfield, which had issued a homeowner's policy to Nakoa that was effective on the date of the fire, learned of the loss and began investigating it on January 28, 2008. The policy's stated limits were $177,500 for the dwelling, $17,750 for other structures, $133,125 for personal property, and $71,000 for loss of use. The policy contained the following provisions regarding replacement of a destroyed dwelling in a section entitled "Conditions":

---

[1] Nakoa's brothers, Warren Rigg, Steven Rigg, and Larry Rigg, are also named parties in this case.

[2] Nakoa does not label her claim on this point as a cross-appeal, but that is the effect of her challenge to the trial court's judgment.

2

C.     Loss Settlement

* * * * *

1.     The dwelling under coverage A [i.e. Nakoa's house]:

a.     We agree to settle covered losses to the dwelling under Coverage A at replacement costs, without deduction for depreciation up to 125 percent of the specific limit of liability shown in the Declarations of the policy, if you agree to:

(1)     Maintain coverage on the dwelling to 100 percent of its full replacement cost by allowing us to annually adjust the Coverage A limit of liability reflecting any changes in the cost of construction for the area in which the residence premises is located;

(2)     Notify us, within 90 days, of completion of any improvements to the dwelling exceeding $5,000 of the limit of liability shown in the Declarations; and

(3)     Repair or replace the building with new material of like kind and quality within a reasonable time.

b.     If you do not comply with a(1), (2) and (3) above, our limit of liability shall not exceed the limit shown in the Declarations of this policy.

2.     Buildings under Coverage B:

a.     At replacement cost without deduction for depreciation, however, we will pay no more than the smallest of the following amounts for equivalent construction and use:

3

> (1)     The amount actually and necessarily spent to repair or replace the building or part of it;
>
> (2)     The replacement cost of the building of any parts of it;
>
> (3)     The applicable limit of liability show in the Declarations of the policy.
>
> Under 1. and 2. above, we will pay no more than the actual cash value of the damage until actual repair or replacement is completed.
>
> * * * * *
>
> 6.     You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim for any additional liability according to the provisions of this Condition C. Loss Settlement, provided you notify us of your intent to do so within 180 days after the date of loss.

Appellant's App. pp. 162-63.

On April 6, 2008, Nakoa submitted an inventory of personal property she alleged had been lost in the fire, totaling $25,297. On May 9, 2008, counsel for Westfield contacted Nakoa, requesting further proof of loss and documentation regarding the personal property inventory. On July 23, 2008, a contractor submitted an estimate that it would cost $267,368.69 to replace the home, which included demolition of the remains of the previous home.[3]

---

[3] Although Westfield claims there is no evidence that it received this estimate on this date, the cover page of the estimate refers to Westfield, the name of the Westfield agent handling the claim, and the Westfield claim number.

4

On November 4, 2008, Nakoa submitted to an examination under oath (essentially a pre-litigation deposition) by counsel for Westfield regarding her claim. During this examination, Nakoa discussed the fact that she owned a second home in Valparaiso and that she had divided her time living between that home and the home that had burned down. Also, Nakoa stated that she had inherited the destroyed home in 2000 from her mother and that she owned it jointly with her three brothers. However, Nakoa was the only named insured on the Westfield policy and she was the only one who had lived there after their mother's death. Nakoa also was examined at length regarding her personal property claims. Additionally, counsel for Westfield noted during this examination that the house "has to be actually torn down and replaced, correct?" Id. at 221. On June 2, 2009, Nakoa submitted to a second examination under oath at which the personal property claims were discussed at length. There was very little discussion of the value of the home itself during either examination, aside from counsel for Westfield noting that Nakoa had valued it at $183,000 on a claim form and Nakoa stating she had arrived at that figure after consultation with a Westfield agent.

On July 16, 2009, Westfield filed a complaint for interpleader, with Nakoa and her brothers as defendants. The complaint alleged that because of the joint ownership of the destroyed home between Nakoa and her brothers, "Westfield is potentially subject to multiple or inconsistent claims by any or all of the defendants seeking the proceeds or part of the proceeds of the policy due as a result of the destruction of the property." Appellee's App. p. 13. The complaint further sought to deposit $180,978 with the trial

5

court clerk as full discharge of its liability under the policy; the complaint did not identify how Westfield arrived at this figure.

On July 20, 2009, Westfield filed an amended complaint for interpleader. The allegations of this complaint were identical to the first complaint, except that the amount of money that Westfield sought to deposit was $140,600. Again, there was no explanation as to how this figure was arrived at, nor why it was over $40,000 less than the original complaint. On September 29, 2009, Nakoa filed an answer to the amended complaint for interpleader that largely admitted the allegations in the complaint, except that it sought to require Westfield to deposit $399,375 with the clerk, which would represent the maximum policy limits. It does not appear Westfield actually deposited anything with the clerk, nor did it ever pay anything to Nakoa directly on her claim, aside from a $5,000 advance to replace some of her personal property.

On September 13, 2010, Nakoa filed a motion to amend her answer to the interpleader complaint to state counterclaims against Westfield for breach of contract, failure to maintain good faith, and bad faith. Westfield objected to permitting such an amendment.

On September 23, 2010, Nakoa filed a "Verified Demand for Appraisal" pursuant to the following provision of the Westfield policy:

> If under Section I, you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If

6

they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the residence premises is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

1. Each party will pay its own appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

We do not waive any of our rights under this policy by agreeing to an appraisal.

Appellant's App. p. 163. The motion alleged that the parties disagreed on the amount of loss in the case, and further stated that Nakoa believed "that appraisal should resolve the matter in its entirety without further action on the complaint or counterclaim." Id. at 43.

Following a hearing conducted on October 26, 2010, Westfield agreed to submit to the appraisal process, and the trial court ordered that it be completed within ninety days. Because of the agreement regarding the appraisal, Nakoa did not further pursue amending her answer to include the proposed counterclaims. During the appraisal process, one appraiser believed it was appropriate to value Nakoa's loss based solely upon replacement cost of the home and personal property, while the other appraiser also provided a figure for the actual cash value of the property. Ultimately, the first appraiser provided solely the replacement cost of the property as his appraisal, which resulted in a figure of $237,414.57, and did not provide an actual cash value estimate. The other appraiser's

7

figure for replacement cost was identical to the first appraiser's, but he also provided a figure of $108,359.78 as the actual cash value of the lost property.

On January 25, 2011, the umpire agreed with the first appraiser who valued the property at $237,414.57 based solely upon replacement cost as the amount of loss. This appraisal also noted that Nakoa was entitled to an additional $10,200 for loss of use of the property, "if Court finds coverage for this loss." Id. at 58. It also stated that the actual cash value of the loss could be obtained from the second appraiser, if necessary.

On January 28, 2011, Nakoa filed a "Motion for Judgment on Appraisal Award" in the amount of $247,614.57 for the real and personal property and $10,200 for loss of use. Id. at 53. On February 15, 2011, Westfield filed a response to Nakoa's motion. In this response, Westfield claimed that Nakoa's loss should be valued on the basis of the actual cash value of $108,359.78 listed in the second apprasier's appraisal, with which the umpire had not agreed. There is no evidence that at any prior time, either in litigation or in communications with Nakoa, that Westfield had previously suggested the amount of Nakoa's claim should be limited to actual cash value. The basis of Westfield's argument that Nakoa's claim should be limited to actual cash value was that she had failed to meet two purported conditions precedent to an award of replacement cost: she had not actually completed replacement of the home, and she had not provided Westfield with notice within 180 days of the loss that she would seek replacement cost coverage. Westfield also asserted that Nakoa was not entitled to loss of use coverage because after the fire, she had been able to continue residing at her second home in Valparaiso. The trial court

8

conducted a hearing on the matter on February 22, 2011, at which time Nakoa indicated that her brothers had signed waivers disclaiming any interest in any insurance proceeds.

On March 9, 2011, the trial court entered a judgment awarding Nakoa $247,614.57, the replacement cost of the property plus $10,200 for loss of use. Westfield filed a motion to correct error. On July 5, 2011, the trial court granted the motion to correct error to the extent of deducting $10,200 from the judgment for loss of use. It also noted that Nakoa previously had received the $5000 advance from Westfield to replace personal property and it further reduced the judgment by that amount. However, it affirmed utilizing the replacement cost as the proper basis for valuing Nakoa's claim, thus resulting in a net judgment of $233,214.57.[4] Westfield now appeals, and Nakoa cross-appeals.

**Analysis**

We review a trial court's ruling on a motion to correct error for an abuse of discretion. <u>Knowledge A-Z, Inc. v. Sentry Ins.</u>, 891 N.E.2d 581, 584 (Ind. Ct. App. 2008), <u>trans. denied</u>. "An abuse of discretion occurs when the decision is against the logic and effect of the facts and circumstances before the court, and inferences that may be drawn therefrom." <u>Id.</u>

### I. Waiver of "Conditions Precedent"

In denying Westfield's motion to correct error, the trial court expressly stated that Westfield had waived its ability to argue that Nakoa had failed to meet any conditions

---

[4] There appears to be a discrepancy of $200 when comparing the appraiser's report, the original judgment, and the modified judgment. Neither party discusses this discrepancy.

precedent to replacement cost coverage that may have existed in the Westfield policy. The sole question on this issue is whether Westfield waived the ability to assert that Nakoa had not complied with conditions precedent in the policy. We need not resolve whether Nakoa in fact complied with any such conditions, nor do we need to address the precise scope or meaning of any such conditions.

Courts "are not inclined to countenance the playing of games by insurance companies leading to policy defenses, and are prone to require a company to bring to its insured's attention any provision with which compliance is required." Stewart v. Walker, 597 N.E.2d 368, 376 (Ind. Ct. App. 1992) (quoting 8C Appleman, Insurance Law and Practice § 5083.65 (1981)). "It is well settled that contractual provisions of an insurance policy may be waived or that the insurer may be estopped from asserting such provisions." American Standard Ins. Co. of Wisconsin v. Rogers, 788 N.E.2d 873, 876 (Ind. Ct. App. 2003). Whether there has been waiver of a policy provision by an insurer generally is a question of fact. Id. at 877. Although the terms "estoppel" and "waiver" are technically distinct, the terms often are used synonymously with respect to insurance matters. Id. Waiver is an intentional relinquishment of a known right involving both knowledge of the existence of the right and the intent to relinquish it, while the elements of estoppel are the misleading of a party entitled to rely on the acts or statements in question and a consequent change of position to that party's detriment. Id.

Waiver may be implied from the acts, omissions, or conduct of one of the parties to the contract. Id. The conduct of an insurer inconsistent with an intention to rely on the

10

requirements of the policy that leads the insured to believe those requirements will not be insisted upon may be sufficient to constitute waiver. Id. However, mere silence or inaction on the part of an insurer is not sufficient to constitute an express waiver. Tate v. Secura Ins., 587 N.E.2d 665, 671 (Ind. 1992). Estoppel or implied waiver, based on an insurer's silence, generally requires a showing of resulting prejudice to the insured. Id.

Here, the first mention Westfield made that Nakoa failed to satisfy alleged conditions precedent for receipt of replacement cost coverage occurred over three years after the fire that destroyed her home. In the interim, Westfield paid nothing to Nakoa, aside from the $5,000 personal property advance. She was subjected to extensive investigation by Westfield and its attorneys primarily regarding her personal property losses, which included two extensive pre-litigation examinations under oath. An estimate from a contractor for replacing the home was obtained within 180 days of the fire. In July 2009,[5] Westfield filed the interpleader complaint, amended shortly thereafter, that identified the value of Nakoa's loss as either $180,978 or $140,600, without explaining how those figures were arrived at, although it would finally state at the February 2011 hearing that it was based upon its estimate of the actual cash value of Nakoa's losses. Nakoa believed her claim was worth considerably more than that based at least in part on the contractor's estimate of what it would cost to replace the home.

---

[5] The interpleader, which Westfield filed because of the alleged potential for multiple liability under the policy due to co-ownership of the property by Nakoa's brothers, was filed approximately eight months after Westfield learned of the multiple ownership during Nakoa's November 2008 examination under oath.

To resolve the vast discrepancy between Westfield's and Nakoa's valuations of her claim, Nakoa pressed to have the value of her loss appraised as permitted by the policy. Westfield stood silently and idly by and acquiesced to the appraisal process without giving any indication to Nakoa or the trial court that its valuation of Nakoa's loss was based on actual cash value, not replacement cost. The policy provision regarding appraisal required Nakoa to pay the appraiser she chose and to pay one-half of the umpire's fee, which was $750.[6]

We conclude that Westfield's conduct in this case was such that it led Nakoa to believe that it would not insist upon the policy provisions regarding payment of replacement cost versus actual cash value of a loss. We acknowledge that replacement cost provisions in homeowner's policies potentially allow a "windfall" to an insured whose house burns down, in that they may be entitled to an insurance payment that is more than what their old house was worth. See Travelers Indem. Co. v. Armstrong, 442 N.E.2d 349, 353 (Ind. 1982). Thus, insurers generally may insist that payment of replacement cost coverage is accompanied by assurances that the house actually is or will be rebuilt or repaired. Id. Still, it is clear to us in reading the Westfield policy and the declarations page that Nakoa was paying premiums for replacement cost coverage as the basic coverage to which she was entitled.

---

[6] As part of its judgment, the trial court required Westfield to pay an additional $375 to Nakoa, representing one-half of the umpire's fee, which left the other $375 to come directly out of Nakoa's pocket.

Westfield clearly was on notice that Nakoa was seeking replacement cost coverage for her losses no later than when she sought to have the value of her loss appraised. Yet, Westfield made no mention of its current assertions that Nakoa had failed to give timely notice of her intent to seek replacement cost coverage or that she was not entitled to it because she had not actually rebuilt the house. Instead, it permitted Nakoa to incur the personal expense of the appraisal process and the further delay it caused to her receiving any payment under the policy. Such expense and delay represents tangible prejudice to Nakoa caused by Westfield's silence regarding its alleged policy defenses.

We also note, as did the trial court, that it seems unreasonable and unrealistic for Westfield to have expected Nakoa to begin reconstruction of her house when Westfield never paid anything to her towards her real property loss—not the actual cash value of the loss, not replacement cost, nothing at all. Nakoa might have been able to use such funds, even if it was just actual cash value and not full replacement cost, as "seed money" to begin reconstruction. See Nahmias Realty, Inc. v. Cohen, 484 N.E.2d 617, 623 (Ind. Ct. App. 1985), trans. denied. Without any such payment, it is difficult to perceive how a homeowner whose home has burned to the ground could possibly be expected to rebuild it. See Rockford Mut. Ins. Co. v. Pirtle, 911 N.E.2d 60, 65-66 (Ind. Ct. App. 2009) (holding that even when a homeowner's policy requires actual replacement of a house before replacement cost coverage is paid, an insurer's failure to advance necessary funds to rebuild may excuse an insured's failure to rebuild and require payment of replacement cost coverage even if homeowner has not yet rebuilt), trans. denied.

13

In sum, we conclude Westfield waived its ability to assert that Nakoa failed to comply with alleged conditions precedent to replacement cost coverage by, at the very least, standing idly by and permitting the appraisal process to be carried out without mentioning that the difference between the Westfield's and Nakoa's estimates of the value of her loss arose because she was valuing the loss at replacement cost while it was valuing the loss at actual cash value. The trial court did not abuse its discretion in denying Westfield's motion to correct error to the extent it sought to limit Nakoa's recovery to the actual cash value of her loss.

## II. Loss of Use

Next, we address Nakoa's cross-appeal that the trial court erred in granting Westfield's motion to correct error by deducting $10,200 from the original judgment. The trial court did so because it concluded that Nakoa was not entitled to loss of use coverage under the Westfield policy.

When we interpret an insurance policy, our goal is to ascertain and enforce the parties' intent as manifested in the policy. General Cas. Ins. Co. v. Bright, 885 N.E.2d 56, 58 (Ind. Ct. App. 2008). "We construe the insurance policy as a whole and consider all of the provisions of the contract and not just individual words, phrases, or paragraphs." Id. We will give clear and unambiguous language in the policy its plain and ordinary meaning. Id.

The Westfield policy provision governing loss of use claims states that it will pay for "additional living expense" incurred due to a home becoming inhabitable, which is

14

defined as "any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living." Appellant's App. p. 152. Here, Nakoa expressly stated during one of her examinations under oath that she incurred no additional living expenses as a result of the fire. That is because she still possessed the second home in Valparaiso where she continued to live after the destruction of the insured home.[7]

Nakoa asserts that despite this evidence, she was entitled to $10,200 in loss of use coverage because the appraisal agreed to by the umpire said she was entitled to that amount for loss of use of the property and, pursuant to the policy's terms, "the amount agreed upon [in the appraisal] will be the amount of loss." Id. at 163. However, the appraisal also expressly stated that Nakoa was entitled to the $10,200, "if Court finds coverage for this loss." Id. at 58 (emphasis added). Thus, the appraisal did not state definitively that Nakoa was entitled to the $10,200, and it was not the last word on the subject. Rather, it left the final decision to the trial court. Given the plain and unambiguous language of the policy, as well as the uncontradicted evidence that Nakoa did not incur any additional living expenses as a result of the fire, we cannot say the trial court abused its discretion in granting Westfield's motion to correct error to the extent of subtracting the $10,200 for loss of use from the original judgment.

---

[7] The loss of use provision of the Westfield policy also allows claims for fair rental value if part of a destroyed dwelling had been rented out to others. Counsel for Nakoa mentioned at the February 2011 hearing that her nephew had been renting out part of the destroyed home. Our review of the record, however, namely Nakoa's examinations under oath, indicates that the nephew had been living at the second home in Valparaiso that was not destroyed.

**Conclusion**

The trial court did not abuse its discretion in denying Westfield's motion to correct error to the extent it sought to limit Nakoa's recovery to the actual cash value of her loss as opposed to replacement cost, nor did it abuse its discretion in granting that motion to the extent of not requiring Westfield to pay Nakoa $10,200 for alleged loss of use. We affirm.

Affirmed.

KIRSCH, J., and BRADFORD, J., concur.