

IN THE

# Court of Appeals of Indiana

Farmhouse Investments, LLC and Farmhouse Investments, LLC (Series B),

*Appellants-Defendants*

v.

Quattro Real Estate Holdings, LLC,

*Appellee-Plaintiff*



FILED

Aug 25 2025, 9:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

August 25, 2025

Court of Appeals Case No.
24A-PL-3086

Appeal from the Grant Circuit Court

The Honorable Mark E. Spitzer, Judge

Trial Court Cause No.
27C01-2302-PL-11

---

**Opinion by Judge Tavitas**
Judges Vaidik and Felix concur.

**Tavitas, Judge.**

## Case Summary

Farmhouse Investments, LLC (Series B) ("Farmhouse") appeals the order of the trial court granting summary judgment in favor of Quattro Real Estate Holdings, LLC ("Quattro") in Quattro's action alleging that Farmhouse breached an asset purchase agreement ("Agreement"). Farmhouse claims that the trial court erred by granting summary judgment in favor of Quattro because: (1) the misnaming of Quattro as "Quattro, LLC" in the Agreement created a genuine issue of material fact; (2) Quattro was not entitled to judgment as a matter of law because Farmhouse had a right to unilaterally terminate the Agreement; (3) Quattro was not entitled to judgment as a matter of law because Quattro waived strict compliance with the terms of the Agreement; and (4) Quattro was not entitled to specific performance. We disagree and, accordingly, affirm.

## Issues

Farmhouse presents four issues, which we reorder and restate as:

> I. Whether misnaming Quattro as "Quattro, LLC" in the Agreement created a genuine issue of material fact precluding summary judgment.
>
> II. Whether the trial court erred in determining that Farmhouse was entitled to judgment as a matter of law because:
>
> > A. Farmhouse had a right to unilaterally terminate the Agreement.

B.    Quattro waived strict compliance with the terms of the Agreement.

III.    Whether the trial court erred by granting Quattro's request for specific performance.

## Facts

The facts of this case are relatively undisputed. On January 13, 2022, the parties entered into the Agreement. Under this Agreement, Farmhouse agreed to buy from Quattro certain real estate ("the Property") located in Marion, Indiana, for a purchase price of $1,404,000. Farmhouse also paid earnest money in the amount of $28,080. In the Agreement, which was prepared by Farmhouse's attorney, Quattro was identified as "Quattro, LLC." Appellant's App. Vol. II p. 30.

Farmhouse's obligation to close the purchase was set forth in Paragraph 5 of the Agreement as follows:

> 5. *Conditions Precedent to Buyer's Obligation to Close.* The Buyer's obligation to close this transaction is subject to the satisfaction or written waiver by the Buyer, **in Buyer's sole and absolute discretion, of the following conditions, during the Inspection Period** all of which must be fulfilled and existing as of the Closing Date ("Conditions Precedent"):
>
> A. The Seller shall have good and marketable title to the Property and all other permits and licenses to Buyer for its intended use (as applicable); and
>
> B. Except for liens that will be discharged in connection with Closing, the Property shall be free and clear of all liens, charges and encumbrances except for easements, rights of way, site plan,

development, subdivision or other typical instruments on title which do not impose a direct financial burden on the Buyer; and

C. Seller shall have provided any and all other permits, approvals, surveys, engineering or architectural drawings, and renovation permits applicable to the Property;

D. Review and approval of all documents pertaining to the Property within Seller's control; and

E. Completion of review of title and such other due diligence searches and examinations as the Buyer considers necessary, in its sole discretion; and

F. The satisfaction or waiver of all due diligence matters; and

G. Seller's Representations and Warranties contained in Section 6 hereof remain true and accurate on the Closing Date.

*Id*. at 32 (bold emphasis added).

[5]     Paragraph 7 of the Agreement provided for a due-diligence period, described as an "Inspection Period," as follows:

7.  *Inspection Period*.  Buyer and its agents shall have one hundred eighty (180) days following the receipt of the property related information as set forth in the Disclosure Schedules to inspect or cause to be inspected all aspects of the physical, legal, environmental and economic condition of the Property in accordance with the terms and conditions of this Agreement (the "Inspection Period").  Within five (5) days of the Effective Date, Seller will provide Buyer with documents in its possession or control pertaining to the Property that are set forth on Exhibit "C." In the event Seller cannot furnish due diligence documents within five (5) days of the Effective Date, all parties agree the Inspection

Period will not commence until such due diligence documents are furnished, and the Closing Date will be adjusted on a day for day basis to allow Buyer appropriate diligence review.

**If Buyer is not satisfied in its sole and exclusive discretion with the results of such inspections, Buyer may rescind this transaction and terminate this Agreement by sending written notice to Seller which must be received by Seller on or prior to the expiration date of the Inspection Period.** Buyer's Deposit, upon termination, shall be returned to Buyer. Buyer shall have the right to extend this Inspection Period an additional sixty days (60) days ("Extension Period One") prior to the end of the initial Inspection Period by providing Seller written notice ten (10) days prior of Buyer's intent to extend the Inspection period. Upon exercising the right to Extension Period One, Buyer's Deposit shall become non-refundable yet applicable to the Purchase Price. At Buyer's sole discretion, Buyer shall also have the right to extend the Inspection Period an additional sixty (60) days ("Extension Period Two") by providing Seller within ten (10) days prior to Extension Period One's conclusion of Buyer's intent to exercise the Extension Period Two right. Upon notice of Buyer's intent to exercise its right to Extension Period Two, Buyer shall deposit with the Title Company an additional Ten Thousand ($10,000.00) dollars which will become non-refundable, yet applicable to the Purchase Price.

*Id*. at 34 (bold emphasis added).

[6] Closing was governed by Paragraph 8 of the Agreement, which provided:

*Closing*. Buyer and Seller shall close this transaction (the "Closing") no later than thirty (30) days after the Inspection Period ("Closing Date"), as may be adjusted by mutual agreement of the Parties or as set forth in Section 7 above. At the Closing, Seller shall deliver to Buyer (1) a properly executed Warranty Deed subject only to: (i) zoning ordinances and other applicable governmental statutes, ordinances, rules and regulations pertaining to the use or operation

of the Property; (ii) easements and building use restrictions of record which are accepted by Buyer or deemed accepted by Buyer; (2) Seller's Affidavit on the Title Company's Standard Form; (3) Closing Statement; (4) Non-Foreign Person Affidavit; (5) Bill of Sale for all personal property not excluded on Exhibit B; (6) Certificate of Occupancy; (7) assignments of all leases set forth on Schedule 6(e); and (7) Keys to the Property. . . .

*Id.* at 35.

[7] The initial Inspection Period would have expired, at the latest, on September 24, 2022. Farmhouse gave notice to Quattro on June 30, 2022, that it was exercising its right to extend the Inspection Period under Extension Period One. This extended the Inspection Period to November 23, 2022. Farmhouse, however, did not close the purchase during Extension Period One. Farmhouse also did not give notice to Quattro that it was exercising its right to extend the Inspection Period under the option for Extension Period Two, nor did Farmhouse deposit an additional $10,000 in earnest money to secure the second extension period. On December 12, 2022, Quattro contacted Farmhouse's broker to inquire as to closing. Appellant's App. Vol. II p. 203. Farmhouse's broker informed Quattro on December 22, 2022—the day before the thirty-day deadline to close the transaction—that Farmhouse did not intend to move forward with closing and instead sought to mutually terminate the Agreement.[1] *Id.* at 204.

---

[1] Farmhouse had planned to use the Property to grow marijuana, on the hopes that the Indiana General Assembly would legalize marijuana cultivation. When that did not occur, Farmhouse decided that it "w[as not] going to allocate funds to this project." Appellant's App. Vol. II p. 198.

[8]     Paragraph 9 of the Agreement governs termination and provides:

> 9. *Termination.*  This Agreement may be terminated at any time prior to the Closing Date: **(i) by mutual written consent of Buyer and Seller, (ii) by Buyer at any time prior to the end of the Inspection Period,** (iii) by Buyer if a material breach of any provision of this Agreement has been committed by Seller and such material breach has not been waived in writing by Buyer or cured within thirty (30) days of receiving notice of such material breach to the reasonable satisfaction of Buyer, or (iv) by Seller if a material breach of any provision of this Agreement has been committed by Buyer and such material breach has not been waived in writing by Seller or cured within thirty (30) days of receiving notice of such material breach to the reasonable satisfaction of Seller.  In the event of termination of this Agreement, each Party's right of termination under this Section 9 is in addition to any other right it may have under this Agreement, and the exercise of a Party's right of termination will not constitute an election of remedies.

*Id.* at 35 (bold emphasis added).  Quattro declined Farmhouse's request to mutually terminate the Agreement, and Farmhouse never closed the transaction within thirty days as required by the Agreement.

[9]     On February 3, 2023, Quattro, as "Quattro LLC," filed a complaint against Farmhouse seeking specific performance pursuant to Paragraph 14 of the Agreement.  *Id.* at 26.  This paragraph provides: "In the event of a default by Buyer hereunder, Seller shall be entitled to terminate this Agreement and retain the Deposit as liquidated damages, or seek an action for specific performance, which shall be its sole and exclusive remedies. . . ."  *Id.* at 37.  The initial complaint named "Farmhouse Investments, LLC" as the defendant.  An amended complaint, filed on August 4, 2023, added "Farmhouse Investments, LLC (Series

B)" as an additional defendant. A second amended complaint, filed on July 10, 2023, named "Quattro Real Estate Holdings, LLC" as the plaintiff instead of the previously designated "Quattro, LLC." *Id.* at 115.[2]

[10] On August 26, 2024, Quattro filed a motion for summary judgment, along with a supporting brief and designated evidence. On September 24, 2024, Farmhouse filed a cross-motion for summary judgment, along with a supporting brief and its designated evidence. The trial court held a hearing on the summary judgment motions on November 15, 2024, and four days later, entered an order granting Quattro's motion for summary judgment and denying Farmhouse's motion for summary judgment. The trial court concluded that: (1) the misnaming of the seller, Quatro Real Estate Holdings, LLC, as "Quattro, LLC," did not create a genuine issue of material fact precluding summary judgment; (2) Farmhouse did not provide written notice of termination within the Inspection Period and breached the Agreement by failing to close; (3) Quattro did not waive the Inspection Period deadline by failing to strictly insist on the thirty-day closing deadline; and (4) Quattro was entitled to specific performance. Farmhouse now appeals.

---

[2] On August 23, 2024, Quattro filed a stipulation of dismissal without prejudice of Farmhouse Investments, LLC, as a defendant, which the trial court granted, thereby leaving only Farmhouse Investments, LLC (Series B), as a defendant. It is this latter party that we refer to as "Farmhouse" in this opinion.

## Discussion and Decision

### Summary Judgment Standard of Review

Pursuant to Trial Rule 56(C), the party moving for summary judgment "is entitled to summary judgment only if the evidence it designates in support of its motion 'shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Cave Quarries, Inc. v. Warex LLC*, 240 N.E.3d 681, 684-85 (Ind. 2024) (quoting Ind. Trial Rule 56(C)). The purpose of summary judgment is to withdraw issues from the jury only when there are no factual issues for the jury to decide. *Id*. at 685. The summary judgment movant bears the burden of making a prima facie showing that there are no issues of material fact and that it is entitled to judgment as a matter of law. *Burton v. Benner*, 140 N.E.3d 848, 851 (Ind. 2020). The burden then shifts to the non-moving party, who must show the existence of a genuine issue of material fact to avoid summary judgment. *Id*.

On appeal, we review the trial court's ruling on a motion for summary judgment de novo, and we take "care to ensure that no party is denied his day in court." *Schoettmer v. Wright*, 992 N.E.2d 702, 706 (Ind. 2013). We resolve "[a]ny doubt as to any facts or inferences to be drawn therefrom . . . in favor of the non-moving party." *Burton*, 140 N.E.3d at 851. "We limit our review to the materials designated at the trial level." *Gunderson v. Ind. Dep't of Nat. Res.,* 90 N.E.3d 1171, 1175 (Ind. 2018).

Findings of fact and conclusions thereon entered by the trial court aid our review, but they do not bind us. *Cranfill v. Ind. Dep't of Transp.*, 209 N.E.3d 450, 453 (Ind. Ct. App. 2023) (citing *In re Supervised Est. of Kent*, 99 N.E.3d 634, 637 (Ind. 2018)). "Nor is our standard of review or analysis altered by the parties' filing of cross-motions for summary judgment—we simply 'consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law.'" *Id*. (quoting *Erie Indem. Co. v. Est. of Harris*, 99 N.E.3d 625, 629 (Ind. 2018)).

## I. The misnaming of Quattro in the Agreement did not create a genuine issue of material fact precluding summary judgment.

We first address Farmhouse's claim that Quattro being named as "Quattro, LLC" in the Agreement created a genuine issue of material fact precluding summary judgment. As noted above, the seller in this case, which we refer to as "Quattro" is Quattro Real Estate Holdings, LLC. The Agreement, however, referred to the seller as "Quattro, LLC." The situation is complicated because there is another corporate entity named "Quattro, LLC." Farmhouse argues that not only is Quattro Real Estate Holdings, LLC's use of the name "Quattro, LLC" a violation of Indiana corporation law, but also raises the question of whether Quattro Real Estate Holdings, LLC, is the proper party to enforce the Agreement.

Specifically, Farmhouse argues that Quattro Real Estate Holdings, LLC's use of the name "Quattro, LLC" violates Indiana Code Section 23-0.5-3-4(e),[3] which

---

[3] This subsection provides that, subject to certain exceptions not relevant here, "a filing entity conducting business in Indiana under a name, designation, or title other than the name shown in its organic record shall file

requires that a legal entity conducting business under an assumed name file a certificate of assumed name with the Indiana Secretary of State and also violates Indiana Code Section 23-0.5-3-1(a)(1), which provides that a legal entity may not use an assumed name that is already in use by another legal entity registered in Indiana.[4] Farmhouse argues that, because the Agreement named "Quattro, LLC" as the seller, which is the legal name of another entity, Farmhouse cannot be charged with constructive notice that "Quattro, LLC" referred to Quattro Real Estate Holdings, LLC.

[16] As noted by the trial court, the Agreement was prepared by Farmhouse's counsel. Thus, the error in nomenclature was committed by Farmhouse, not Quattro. Moreover, the designated evidence clearly shows that title to the Property was held by Quattro Real Estate Holdings, LLC. The title commitment was issued on January 31, 2022, and noted that the Property was titled in the name of Quattro Real Estate Holdings, LLC. This apparently did not concern Farmhouse, who did not complain about this discrepancy at that time. Indeed, there is nothing in the designated evidence that suggests Farmhouse was misled as to the identity of the seller.

[17] We rejected a similar argument over forty years ago. In *Parker v. Rod Johnson Farm Services, Inc.*, 384 N.E.2d 1129, 1130 (Ind. Ct. App. 1979), Parker entered into a

with the secretary of state a certificate stating the assumed name or names to be used and the full name and address of the entity's principal office in Indiana." Ind. Code § 23-0.5-3-4(e).

[4] This subsection provides that, subject to exceptions not relevant here, "after December 31, 2017, . . . an assumed name registered under section 4 of this chapter must be distinguishable on the records of the secretary of state from any: (1) name of an existing domestic filing entity . . . ." Ind. Code § 23-0.5-3-1(a)(1).

contract with "Rod Johnson Farm Services" for the delivery of soybeans. When Parker did not deliver the amount of soybeans called for in the contract, Rod Johnson Farm Services, Inc., brought suit against Parker for breach of contract. The trial court entered judgment for the plaintiff. On appeal, Parker claimed that Rod Johnson Farm Services, Inc., could not recover because the buyer was listed in the contract as Rod Johnson Farm Services, without the "Inc." The *Parker* Court was not impressed, writing:

> It is true that, as a corporation, Farm Service was required to include "Inc." as part of its corporate name. It is also true that a corporation which conducts business under any other name or designation is required to file a certificate stating such assumed names. No evidence was presented showing that Farm Service had complied with this statute. However, this statute is designed to protect the public from fraud and imposition by preventing a corporate entity from concealing its identity. For that reason, it has been held not to invalidate contracts entered into in violation of its terms.
>
> . . . Parker had no question regarding the identity of the corporate entity, either when arranging the sale or when appearing to defend the action. Parker had dealings with Farm Service from 1971 or 1972 through 1974 and personally knew both managers. Parker has failed to demonstrate how his legal rights were jeopardized by the incorrect designation of "Rod Johnson Farm Service," which appeared on the confirmation of purchase.

*Id*. at 1131 (citations omitted).

[18] Although the misnaming involved here is more than just the omission of the word "Inc.," we reiterate that the mistake in the Agreement was made by Farmhouse,

not Quattro. Farmhouse was on notice that title to the Property was held by Quattro Real Estate Holdings, LLC, not "Quattro, LLC," and there is no indication that Farmhouse's legal rights were jeopardized by the misnaming of Quattro in the Agreement. We, therefore, agree with the trial court that Farmhouse cannot escape its contractual obligations simply because Farmhouse misnamed the seller in the Agreement. Thus, the misnaming of Quattro in the Agreement did not create a genuine issue of material fact precluding summary judgment.

## II. Quattro was entitled to judgment as a matter of law.

[19]   Farmhouse also argues that the trial court erred by concluding that Quattro was entitled to judgment as a matter of law because: (A) Farmhouse had a right to unilaterally terminate the Agreement based on a determination, in its sole discretion, that the conditions precedent had not been satisfied or waived; and (B) Quattro waived strict compliance with the terms of the Agreement by not insisting on closing within thirty days of the expiration of the Inspection Period. We disagree.

## A. Farmhouse's right to unilaterally terminate the Agreement was limited to the Inspection Period.

[20]   Farmhouse claims that the trial court erred by concluding that Farmhouse's right to unilaterally terminate the Agreement was limited to the Inspection Period. Addressing this claim requires us to interpret the Agreement. The interpretation of contracts is generally a question of law. *Celadon Trucking Servs., Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind. Ct. App. 2017) (citing *Tender Loving Care Mgmt., Inc. v.*

*Sherls*, 14 N.E.3d 67, 72 (Ind. Ct. App. 2014)), *trans. denied*. "'The goal of contract interpretation is to determine the intent of the parties when they made the agreement.'" *Id*. (quoting *Tender Loving Care*, 14 N.E.3d at 72). We "must examine the plain language of the contract, read it in context and, whenever possible, construe it so as to render every word, phrase, and term meaningful, unambiguous, and harmonious with the whole." *Id*.

[21] "If contract language is unambiguous, this court may not look to extrinsic evidence to expand, vary, or explain the instrument but must determine the parties' intent from the four corners of the instrument." *Id*. "And, in reading the terms of a contract together, we keep in mind that the more specific terms control over any inconsistent general statements." *DLZ Ind., LLC v. Greene Cnty*., 902 N.E.2d 323, 328 (Ind. Ct. App. 2009) (citing *City of Hammond v. Plys*, 893 N.E.2d 1, 4 (Ind. Ct. App. 2008)). "To the extent the contract reveals any ambiguities, those ambiguities are generally construed against the drafter." *Thomas v. Valpo Motors, Inc.*, 258 N.E.3d 236, 241 (Ind. 2025).

[22] Farmhouse claims that it had an unfettered right to unilaterally terminate the Agreement if it determined, in its sole discretion, that all the conditions precedent were not satisfied or waived. Farmhouse's argument is based on Paragraph 5 of the Agreement, which provides that Farmhouse's "obligation to close this transaction is subject to the satisfaction or written waiver by [Farmhouse], in [Farmhouse's] sole and absolute discretion, of the [conditions precedent] **during the Inspection Period** all of which must be fulfilled and existing as of the Closing Date." Appellant's App. Vol. II p. 32 (emphasis added).

[23] We find no ambiguities in the Agreement regarding the limits on Farmhouse's ability to terminate the Agreement. Farmhouse's "sole and absolute discretion" to determine whether the conditions precedent had been satisfied or waived is clearly limited by Paragraph 5 to the Inspection Period. Our conclusion is supported by the other terms of the Agreement. Paragraph 7 of the Agreement provides that, if Farmhouse was not satisfied with the results of its inspections of the Property, it could rescind the transaction and terminate the Agreement by sending "written notice" to Quattro "on or prior to the expiration of the Inspection Period." *Id*. at 33. It is undisputed that Farmhouse provided no such notice to Quattro during the Inspection Period. And Paragraph 9 listed the four instances in which the Agreement could be terminated: (1) by mutual written consent, (2) by Farmhouse "prior to the end of the Inspection Period," (3) by Farmhouse due to a material breach by Quattro, and (4) by Quattro due to an uncured material breach by Farmhouse. *Id*. at 35.

[24] We, therefore, agree with the trial court that, when read together, these provisions unambiguously establish that Farmhouse could not unilaterally terminate the Agreement outside the Inspection Period unless there was a material breach by Quattro, and there is no suggestion that Quattro materially breached the Agreement.

### B. Quattro did not waive strict compliance with the terms of the Agreement.

[25] Farmhouse also argues that Quattro waived enforcement of the Inspection Period deadline, thereby extending Farmhouse's right to unilaterally terminate the

Agreement, by not strictly enforcing the thirty-day closing deadline. "Waiver of a contractual provision is an intentional relinquishment of a known right involving both knowledge of the existence of the right and the intent to relinquish it." *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1051 (Ind. Ct. App. 2012) (citing *Westfield Nat. Ins. Co. v. Nakoa*, 963 N.E.2d 1126, 1132 (Ind. Ct. App. 2012)), *trans. denied.* "'Waiver may be implied from the acts, omissions, or conduct of one of the parties to the contract.'" *Id.* (quoting *Westfield*, 963 N.E.2d at 1132). However, "[s]ilence, inactivity[,] or acquiescence is not waiver unless the party against whom waiver is claimed had a duty to act or speak." *M.O. v. Ind. Dep't of Ins. Patient's Comp. Fund*, 968 N.E.2d 254, 261 (Ind. Ct. App. 2012) (citing *Hastetter v. Fetter Props., LLC*, 873 N.E.2d 679, 684 (Ind. Ct. App. 2007)).

[26] The Inspection Period was set to expire on September 24, 2022, but was extended by Farmhouse for an additional sixty days when Farmhouse exercised its right under Extension Period One by giving Quattro written notification, thereby making the earnest money deposit non-refundable. This extended the Inspection Period to November 23, 2022. Farmhouse, however, did not further extend the Inspection Period by exercising its right under Extension Period Two by paying an additional $10,000 toward the purchase price and giving Quattro written notice. Thus, the Inspection Period, by operation of the plain language of the Agreement, expired on November 23, 2022, and Farmhouse's right to unilaterally terminate the Agreement expired on that date.

[27] Farmhouse argues that Quattro waived strict compliance with the Inspection Period deadline because Quattro did not affirmatively insist that Farmhouse close

the deal within thirty days of the expiration of the Inspection Period. This argument is illogical.

[28] The Agreement put no duty on Quattro to affirmatively "end" the Inspection Period; the Inspection Period simply ended by operation of the contractual language when Farmhouse failed to exercise its right to extend the Inspection Period under Extension Period Two.

[29] Nor did the Agreement place a duty on Quattro alone to affirmatively set a closing date. Instead, Paragraph 8 of the Agreement states that "Buyer and Seller shall close this transaction (the "Closing") no later than thirty (30) days after the Inspection Period ("Closing Date"), as may be adjusted by mutual agreement of the Parties or as set forth in Section 7 above."[5] Appellant's App. Vol. II p. 35. The designated evidence shows that, prior to the closing deadline, Quattro contacted Farmhouse's broker to ask about the closing. *Id*. at 203. It was not until the day before the thirty-day closing deadline was set to expire that Farmhouse's broker informed Quattro that Farmhouse wished to terminate the Agreement. *Id*. at 204. Closing the transaction required the joint action of both parties, and Farmhouse indicated that it did not intend to move forward with the closing. That Quattro did not affirmatively insist that Farmhouse move forward

---

[5] This appears to be a reference to Paragraph 7 of the Agreement, which provides that, if Farmhouse was not satisfied with the results of its inspections of the Property, it could rescind the transaction and terminate the Agreement by sending "written notice" to Quattro "on or prior to the expiration of the Inspection Period." *Id*. at 157. But Farmhouse sent no such written notice prior to the expiration of the Inspection Period.

with closing, when it already knew that Farmhouse did not intend to close the transaction, did not waive strict compliance with the Agreement.

[30] The fact that the transaction did not close within thirty days after the expiration of the Inspection Period did not resurrect the already-expired Inspection Period. We, therefore, find unpersuasive Farmhouse's argument that it had the right to unilaterally terminate the Agreement even after the expiration of the Inspection Period. Accordingly, we conclude that the trial court did not err by rejecting Farmhouse's claim that, by failing to affirmatively set a closing date, Quattro waived strict compliance with the Inspection Period deadline, thereby extending Farmhouse's right to unilaterally terminate the Agreement.

## III.  The Agreement permits Quattro to seek specific performance of the Agreement.

[31] Farmhouse also contends that Quattro was not entitled to seek specific performance of the Agreement. "The grant of specific performance requires the 'performance of a contract according to the precise terms agreed upon, or substantially in accordance therewith.'" *Metro Holdings One, LLC v. Flynn Creek Partners, LLC*, 25 N.E.3d 141, 161 (Ind. Ct. App. 2014) (quoting *Salin Bank & Tr. Co. v. Violet U. Peden Tr.*, 715 N.E.2d 1003, 1007 (Ind. Ct. App. 1999)). Specific performance is an equitable remedy. *Kesler v. Marshall*, 792 N.E.2d 893, 896 (Ind. Ct. App. 2003), *trans. denied*. A court's power to order the equitable remedy of specific performance is an extraordinary power that is not available to a party as a matter of right. *Id.* Courts should not exercise equitable powers when there is an adequate remedy at law. *Id.* at 897. When dealing with contracts for the purchase

of real estate, Indiana courts routinely order specific performance because "each piece of real estate is considered unique, without an identical counterpart anywhere else in the world." *Id*.; *see also Fulp v. Gilliland*, 998 N.E.2d 204, 210 (Ind. 2013) ("Because real estate is unique, courts routinely grant specific performance of purchase agreements[.]") (citing *Kesler*, 792 N.E.2d at 896).

[32] Farmhouse argues that the trial court erred by granting specific performance of the Agreement because, it claims, Quattro had an adequate remedy at law via monetary damages. Farmhouse cites *Kesler*, 792 N.E.2d 893, in support of its argument. In that case, the trial court granted specific performance of a contract for the purchase of real estate and required the buyer to purchase the land at issue. On appeal, this Court held that the trial court erred in granting specific performance because "none of the [trial] court's findings support[ed] the conclusion that monetary damages would be insufficient to fully compensate" the seller and stated that the seller "could have kept [the buyer's] earnest money and terminated the contract, or resold the property and held [the buyer] liable for the difference between the actual sale price and the price under the contract." *Id*. The Court, therefore, held that under those circumstances, the trial court erred by ordering the buyer to specifically perform the contract. *Id*.

[33] In *Metro Holdings*, 25 N.E.3d 141, another panel of this Court distinguished *Kesler*. In *Metro Holdings*, the contract included language that the seller had the right to specific performance. *Id*. at 164. Because the contract allowed the seller to choose either the legal remedy of monetary damages or the equitable remedy of specific

performance, the Court held that the trial court did not abuse its discretion by granting the request for specific performance. *Id*.

[34]     Farmhouse claims that *Metro Holdings* is distinguishable because the contract in that case stated that the seller had the "right"[6] to specific performance, whereas the Agreement in this case does not say that Quattro has a right to specific performance. We disagree. The Agreement clearly states that "in the event of a default by [Farmhouse] hereunder, [Quattro] **shall be entitled** to terminate this Agreement and retain the Deposit as liquidated damages, **or** seek an action for specific performance, which shall be its sole and exclusive remedies. . . ." Appellant's App. Vol. II at 37 (emphasis added). Thus, the Agreement says that Quattro has a right to one of two remedies: the legal remedy of liquidated damages or the equitable remedy of specific performance. Quattro sought the latter, as was its right under the Agreement.

[35]     Because the Agreement provided that Quattro was entitled to seek specific performance, and because Indiana law recognizes the uniqueness of real estate, we cannot say that the trial court erred by granting Quattro's request for specific performance. *See id*.

---

[6] The contract in *Metro Holdings* actually stated that the seller "may **seek** any remedy provided by equity or law, **including the right of specific performance**, or terminate this agreement and receive the earnest money as liquidated damages." *Id*. at 149 (emphasis added, capitalization altered).

## Conclusion

No genuine issue of material fact existed regarding Quattro's identity in the Agreement. And the trial court properly determined that Quattro was entitled to judgment as a matter of law because Farmhouse's right to unilaterally terminate the Agreement was limited to the Inspection period and because Quattro did not waive strict compliance with the terms of the Agreement. Lastly, the trial court did not err by granting Quattro's request for specific performance because Quattro was entitled under the Agreement to choose to seek the remedy of specific performance. Accordingly, we affirm the trial court's grant of summary judgment to Quattro.

Affirmed.

Vaidik, J., and Felix, J., concur.

ATTORNEYS FOR APPELLANTS

Daniel M. Drewry
Jeffrey M. Kraft
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gabriel H. Retz
Scott L. Starr
Starr Austen & Miller, LLP
Logansport, Indiana